[No. 35591. *En Banc.* January 11, 1962.]

THE STATE OF WASHINGTON, *Respondent,* v. FRANK T. BELL, *Appellant.*\*

*Reported in 368 P. (2d) 177.

*W. Walters Miller, Miller, Jansen & Sackmann,* and *Moe & Kight,* for appellant.

*Paul Klasen,* for respondent.

DONWORTH, J.—Appellant was found guilty as charged in five counts of an indictment charging him with first-degree perjury in his testimony before a grand jury which had been called in Grant County. He waived a jury trial and was tried before a visiting judge, who imposed a sentence of not more than 15 years' imprisonment in the state penitentiary for each count (to run concurrently) and payment of the costs of prosecution.

The trial of the case consumed two weeks. The record is voluminous. The statement of facts consists of more than 1200 pages; over 100 exhibits were offered in evidence; and the transcript contains 280 pages of motions, affidavits, findings of fact, and court orders.

In presenting this appeal from his judgment and sentence, appellant contends that the trial court erred to his prejudice in 123 instances, each of which is specifically described in his assignments of error. He asks that this case be dismissed by this court, or, in the alternative, that he be granted a new trial.

To give a detailed resume of all the oral testimony and documentary evidence admitted at the trial, as well as the purport of the many pretrial and post-trial motions and similar proceedings, would extend this opinion beyond all reasonable bounds. We have made a thorough examination of the entire record in the light of the extensive arguments contained in the briefs and presented orally to this court by counsel. We, therefore, will endeavor to state as succinctly as possible the factual background of appellant's indictment and conviction.

The grand jury was impaneled August 25, 1958, and proceeded to investigate certain alleged criminal activities arising in connection with the construction of the Priest Rapids Dam on the Columbia River by Public Utility District No. 2 of Grant County (herein referred to as the PUD). The prime contractor was Merritt, Chapman and Scott

Corporation (herein referred to as MCS). There had been rumors of substantial gratuities and payments of money made by MCS to officers of the PUD (including its manager, Glenn A. Smothers).

In July, 1956, MCS was awarded the contract for the construction of the Priest Rapids Dam. The prime contractor's compensation was approximately $91,000,000.

About two weeks later, MCS paid the McLean corporation $87,500. This corporation was controlled by the partners of a certain Washington, D. C. law firm. Several of the partners were close friends of appellant of many years' standing. During 1957 and early 1958, McLean gave appellant six checks totalling $16,193.49. On the receipt of each check, appellant gave his check for one half thereof to Glenn A. Smothers, the manager of the PUD. Each check bore a notation "Consultation."

In addition, appellant gave Smothers a check for one half of the amount of $6,500 which he received from the Shoup Voting Machine Company (according to appellant's testimony) as a finder's fee for locating prospective business in Vancouver, Washington, and Portland, Oregon.

Also, appellant sold to Smothers, for $250, one-half interest in his stock in the Dominican corporation, hereinafter referred to. Upon the sale of it, he paid Smothers $2,350.

The total amount of the checks given by appellant to Smothers was approximately $13,700.

Appellant voluntarily appeared before the grand jury on November 5, 1958, was duly sworn, and testified. His testimony on that day related chiefly to the receipt of the checks referred to above and to his payments of one half to Smothers. (The indictment charged him with perjury with respect to some of his testimony relating to these transactions.) Prior to his appearance, approximately 30 other witnesses had testified before the grand jury.

Appellant again testified before the grand jury on March 13, 1959. In July, 1959, at his request, his deposition was taken by the prosecuting attorney in the presence of his counsel. This was submitted to the grand jury at appellant's request.

August 27, 1959, the grand jury returned an indictment charging appellant with first-degree perjury in five counts. They read as follows:

"Count I.

"That the said defendant, Frank T. Bell, in the County of Grant, State of Washington, was called as a witness before this Grand Jury to testify in a hearing, inquiry and investigation then pending before this Grand Jury, before which Grand Jury, in which hearing, inquiry and investigation, an oath might lawfully be administered, and that an oath was lawfully administered to the said defendant, Frank T. Bell, by the foreman of the Grand Jury, who was duly and lawfully authorized so to do, and after the said defendant, Frank T. Bell, was so duly sworn before this Grand Jury and in said hearing, investigation and inquiry, as aforesaid, he, the said defendant, Frank T. Bell, did testify before said Grand Jury on November 5, 1958, and the said defendant, Frank T. Bell, did then and there in said hearing, inquiry and investigation, as aforesaid, unlawfully, feloniously, willfully, corruptly, knowingly and contrary to said oath, testify and swear as true the following material matters pertaining to the disbursement and considerations of sums of money to and from the defendant, Frank T. Bell, and the disbursement of sums of money by said defendant, Frank T. Bell, to one Glenn Smothers during 1956 through 1958, said Glenn Smothers being, during said dates, a public officer of Grant County, State of Washington, and pertaining to the employment of said defendant Frank T. Bell, the terms of said employment, the manner and circumstances in which said Frank T. Bell acquired said employment, and the manner in which said defendant, Frank T. Bell, would be compensated by said employer, the McLean Finance and Investment Company, also known as McLean Development Company and McLean Finance Corporation (Company) and McLean Engineering Company and the receipts and attendant circumstances in which sums of money were received from said McLean Finance and Investment Company, also known as McLean Development Company and McLean Finance Corporation (Company) and McLean Engineering Company by the said defendant, Frank T. Bell for employment compensation of the said Frank T. Bell, during the years 1956 to 1958, in substance and effect as follows, to-wit:

"That Lewis M. Schott contacted the defendant, Frank T. Bell, and procured employment for said Frank T. Bell,

with the McLean Finance and Investment Company of New York;

"WHEREAS, IN TRUTH AND IN FACT Lewis M. Schott never contacted the defendant Frank T. Bell for employment with the McLean Finance and Investment Company of New York and never procured employment for said defendant, Frank T. Bell, with the McLean Finance and Investment Company of NewYork,

"Contrary to the Revised Code of the State of Washington 9.72.010, the statute in such case made and provided, and against the peace and dignity of the State of Washington.

"COUNT II. [Preamble the same as Count I, omitted]

"That Lewis M. Schott, acting for the McLean Finance and Investment Company of New York, directed Frank T. Bell to investigate a project in Juneau, Alaska and to make a report on said project for said Company;

"WHEREAS, IN TRUTH AND IN FACT Lewis M. Schott was never an agent, employee, stockholder, officer or director of the McLean Finance and Investment Company of New York and never acted for the McLean Finance and Investment Company of New York and never directed the defendant, Frank T. Bell to investigate a project in Juneau, Alaska and never requested the defendant, Frank T. Bell to make a report on said project for the McLean Finance and Investment Company of New York, . . .

"COUNT III. [Preamble, the same as Count I, omitted]

"That the defendant, Frank T. Bell, called Lewis M. Schott and arrived at a determination of the defendant, Frank T. Bell's compensation for said defendant, Frank T. Bell's work involving the investigation of a project in Juneau, Alaska, and that said compensation was agreed upon by Lewis M. Schott, for and on behalf of the McLean Finance and Investment Company of New York, to be in the sum of $5,568.49;

"WHEREAS, IN TRUTH AND IN FACT the defendant, Frank T. Bell, never called Lewis M. Schott to arrive at a determination of the amount of defendant, Frank T. Bell's compensation for said defendant, Frank T. Bell's work involving the investigation of said project in Juneau, Alaska, and Lewis M. Schott never agreed that compensation should be paid to said defendant, Frank T. Bell, in the amount of the sum of $5,568.49 for and on behalf of the McLean Finance and Investment Company of New York, . . .

"COUNT IV. That the said defendant, Frank T. Bell, in the County of Grant, State of Washington, was called as a

witness before this Grand Jury to testify in a hearing, inquiry and investigation then pending before this Grand Jury, before which Grand Jury, in which hearing, inquiry and investigation, an oath might lawfully be administered, and that an oath was lawfully administered to the said defendant, Frank T. Bell, by the foreman of the Grand Jury, who was duly and lawfully authorized so to do, and after the said defendant, Frank T. Bell, was so duly sworn before this Grand Jury and in said hearing, investigation and inquiry as aforesaid, he the said defendant, Frank T. Bell, did testify before said Grand Jury on November 5, 1958, and the said defendant, Frank T. Bell, did then and there in said hearing, inquiry and investigation, as aforesaid, unlawfully, feloniously, willfully, corruptly, knowingly and contrary to said oath, testify and swear as true the following material matters pertaining to Frank T. Bell's employment or activities for the Shoup Voting Machine Company and the receipt and disbursement of moneys to a public official, to-wit: one Glenn Smothers, during which time the said Glenn Smothers was the manager of the Public Utility District No. 2 of Grant County, Washington, and the receipt of monies by the said defendant, Frank T. Bell, during the years 1956 through 1958, in substance and in effect as follows, to-wit:

"That the said defendant, Frank T. Bell, received monies from the Shoup Voting Machine Company, as a finder's fee;

"WHEREAS, IN TRUTH AND IN FACT, the said defendant, Frank T. Bell, never received any monies from the Shoup Voting Machine Company as a finder's fee, . . .

"COUNT V. [Preamble, same as Count IV, omitted]

"That the said defendant, Frank T. Bell, as a result of his efforts from the sale of Shoup Voting Machines in Clark County, Washington, and in Portland, Oregon, received a commission in the amount of $6,500.00, the same being based on a percentage of the sales price of Shoup Voting Machines sold in Clark County, Washington and Portland, Oregon;

"WHEREAS, IN TRUTH AND IN FACT, the sum of $6,500.00 was not paid by the Shoup Voting Machine Company to the said defendant, Frank T. Bell, as a percentage commission of the results of the sales of any Shoup Voting Machines, sold in Clark County, Washington and Portland, Oregon, . . ."

To all of these counts appellant pleaded not guilty.

At this point, before discussing appellant's assignments of error, it will be helpful to an understanding of the major

issues to read the trial court's oral decision rendered at the close of the taking of evidence and after hearing the arguments of counsel. The trial judge stated the reasons for his decision as follows:

"THE COURT: The defendant in this case is charged, by an Indictment, issued by the Grand Jury, which was duly and regularly called in this community. The Indictment was issued on August 27th, 1959, and has charged the defendant in this case with the crime of perjury in the first degree, five counts.

"The defendant in this case waived a jury trial and the case was tried to the Court.

"Whereas a jury, in rendering its verdict, is required in law to simply state guilty or not guilty, I believe it is the duty of the Court to give its reasons for the conclusions which it has reached.

"The crime charged is perjury in the first degree. Counsel for the State and counsel for the defendant have called attention to the Court that in some respects the crime of perjury is unique, and that it is considered to be one of the most difficult of proof. And, indeed, it is the law that, as distinguished from every other major crime, with the sole exception of treason, the law has imposed upon the prosecution an additional burden, which it does not have to assume with the ordinary felony.

"In any case in which a defendant is charged with crime, because he is an American Citizen, he is entitled to a presumption of innocence, which he carries with him until the jury renders its verdict or the Court renders it judgment.

"The prosecution must meet and accept the burden of establishing an accused's guilt, beyond a reasonable doubt. Now, this is generally recognized by scholars as being a qualitative test. But in addition to this qualitative test the law says that with perjury we have another test, which legal scholars sometimes refer to as a quantitative test, and that is that in addition to the normal burden, the prosecution must produce two credible witnesses who will contradict the accused or if not two, one and other credible evidence to support the contradicting witness.

"Now, this unusual rule, which is somewhat of an anachronism in our legal system, has an interesting historical background, which is not particularly pertinent here, but I think it does have a bearing upon the problem which

confronts the Court in this case and I will touch upon it briefly.

"The old Roman Law relied largely upon numerical numbers; disputes were often settled in those courts by the mere balance of numbers of witnesses who would swear for one side or the other. Some vestiges of that Roman concept carried over into our early Anglo-Saxon law and found their way into the ecclesiastical law, which was a part of the early beginning of the Anglo-Saxon system.

"In those primitive Anglo-Saxon days various ways to find the truth were tried. There was trial by combat, which was eventually abandoned, as it should have been, as not being a proper way to find the truth or achieve justice. And then there was trial by ordeal, where a person was required to thrust his hand into boiling water or his foot on hot burning coals, and that was eventually abandoned as a primitive system.

"The next step was the concept of the oath, and judgments were rendered by what were called in those days by compurgators, people who would swear to matters that were in dispute, and as a carry over from the Roman system in the early beginning the idea was that the side that had the most swearers should win. The theory was that if a man stood up and laid his hand on the Bible and swore before God that he was going to tell the truth, the whole truth and nothing but the truth, that if he didn't he would be instantly struck down. Apparently that idea was prevalent enough that the judicial system for a good many years was based upon that concept. But that idea was abandoned too with more enlightenment.

"Eventually the oath was recognized as a device which usually could be relied upon, because usually honest men and honorable men told the truth, but it was learned, of course, that every man who swore to tell the truth was not always honorable or honest, and other means of testing credibility were devised, such as cross examination and the right to counsel. But as the common law broke away from the old system of compurgators or witnesses, because of a historical accident, some scholars believe, the concept still clung to the crime of perjury. The theory being because of the peculiar nature of the crime, the accused having been charged with swearing falsely, that there had to be at least one swearing to balance his swearing so that there was a balance to start with. But, other scholars have concluded that the reason that this apparent anachronism still remains

in our law is another one, which has more meaning to us, and that is that the oath is so important to our system of jurisprudence that the law should give some assurance to a person who testifies that he will not be persecuted or harassed, after he has given his testimony, by persons who may have an ulterior motive for doing so. The theory is that when he comes into court or some other tribunal, he should do so with the confidence that it is unlikely that he would have to suffer the difficulties which would obtain were he charged with perjury.

"Now, I have taken this long to mention this because of the peculiar unusual problem which is presented by the peculiar circumstances of this case.

"In order to meet this quantitative test which the law requires, the State in this case has had to call two witnesses to contradict the defendant's testimony, each of whom has professed, under oath, to be a friend of the defendant and to hold him in highest regard, and each of whom has likewise been designated by the defendant as his good friend. The State has been confronted with this additional unusual problem in this case and that is the direction or focus of all the circumstantial evidence and inferences which it has presented to the Grand Jury, and which I will touch upon in a moment, suggests that it is possible, if not probable, that the defendant and the two witnesses upon whom they rely are all engaged in a conspiracy. The ultimate objective of which was to funnel bribery money from the prime contractor, Merritt-Chapman & Scott, to the general manager of the PUD, Mr. Glenn Smothers.

"Now, the alleged perjured testimony in this case was presented before a Grand Jury. That Grand Jury was called, the record shows, after due deliberation by the judges of this county, because there was a public outcry, public concern of evidence of lavish gifts being bestowed upon the manager of the PUD by the prime contractor, and because of differences of opinion which arose between that manager and its general counsel, and because its general counsel, Mr. Washington, had concluded and so stated that he believed that the general manager was performing illegal acts which probably could result in costs to the PUD of vast excessive sums of money. Specifically, Mr. Washington criticized Extra Work Order No. 6, which was a negotiated contract between the PUD and the general contractor to construct fish facilities for a cost which ran into the millions of dollars.

"Now, as I stated in ruling upon some of the proffered

evidence of the defendant, it is not my function in this case to decide whether or not Mr. Washington was right in his analysis and conclusions as to these actions. The important matter is that the Grand Jury was told that this was what it was to investigate, and it was told this by the presiding judge of this county in his charge to the jury.

"Now, the Grand Jury as used in state courts is also a part of our judicial system which is in some ways old fashioned; I think that is not a very good word, but a better one doesn't occur to me at the time. But, it is true that in our country the Grand Jury is the ultimate weapon, if I can use that phrase, of a free people to protect themselves from dishonesty and corruption and tyranny by their public officials. As the judge in this case cautioned the Grand Jury, they have terrible powers and they should use their powers with discretion. The Grand Jury has the right, which the prosecuting attorney does not have, and an important right in instances where the problems are of great magnitude and involve public officials, and that is the right of subpoena of witnesses and the right to require that they appear before the Grand Jury and testify truthfully under oath.

"This is the law of this State and generally of this country, 'That any reasonable inquiry made or information sought by a Grand Jury engaged in investigating alleged crimes is entitled to the most open and candid respect and if a false answer or information given tends in any manner to hinder or delay the inquiry, it is a material matter to that inquiry.'

"I come now to a brief analysis of the evidence in this case which I think is material to the decision which I have reached.

"It is conceded by all counsel that there are basically three elements to the crime charged. The State must prove, first, that the testimony was false, it must prove, secondly, that it was given willfully and unlawfully and feloniously, and it must prove, thirdly, that the false testimony was material.

"It is my considered opinion that there is no question but the testimony in this case, as charged in each of these five Counts was false. And, in my opinion there is no question but what it was willfully false. There has been a suggestion made that the defendant was confused or that he was an old man and that he was, perhaps, abandoned by his co-conspirators and as it was, 'thrown to the dogs.'

"As I stated in ruling early in the case, the only fair way to analyze testimony in a charge of this nature is to read

it all so that it can not be read out of context, and I have read and re-read the testimony in this case carefully, and it is my considered opinion that the defendant was not confused, that he was evasive and that he was attempting to confuse, rather than giving testimony which was the result of his own confusion. I am convinced that the evidence overwhelmingly establishes that his false testimony was willful and that it was done for the purpose of misleading and deceiving this Grand Jury.

"As I read the testimony I could sympathize with the Grand Jurors and I would subscribe to their comments that the story that he was telling them was unbelievable, almost an insult to their intelligence.

"Now, we come to the question which has been the subject of the most intensive attack by the defense, as I have interpreted it, and that is as to the materiality. It must be recognized here that the test is not did the false testimony hinder or delay, the test is did it tend to hinder or delay. In my considered opinion the evidence in this case establishes not only that it tended to hinder or delay, but that it in fact did hinder and delay.

"Much argument has been made that what difference did it make; supposing the defendant had testified that he was paid for being a public relations expert and not a finder's fee or a commission? Before I answer the question I digress to make this observation. As I have carefully analyzed the testimony concerning Counts IV and V, which concern the so called finder's fee, read in their entirety it was apparent that on November the 5th, 1958, the day upon which we must analyze this testimony, the defendant made it clear that what he was receiving was—I don't care whether you call it a commission or a fee—he was receiving something for something sold, and, indeed, he had to tell it that way otherwise his testimony as to paying Mr. Smothers half of it made no sense to the Grand Jury. The whole import of his testimony in that regard was that he was paying Mr. Smothers because Mr. Smothers found the buyers which enabled him to collect his commissions.

"But, to answer the question that I propounded a moment ago, when the defense asked what difference does it make, it makes this difference if no other: I think it is well to recall what the nature of an oath is. The oath has basically two parts to it, an affirmative part and a negative part. When a man swears that he will tell nothing but the truth, he swears that he will not give false information. But, on the other hand, when he swears that he will tell the truth

and the whole truth, he swears that he will give true information. If the defendant had given true information in this case the work of the Grand Jury would have been materially lessened.

"Now, finally I alluded to the reason that I dwelled upon the peculiar problem of the so called quantitative evidence and the necessity that there be another witness or two and the peculiar problem presented by the circumstances of this case which have forced the State to rely upon the testimony of two men who, their evidence suggests, are fellow conspirators. The basic problem of a trier of the fact is to weigh credibility of witnesses and any judge or jury soon finds that there are no mechanical rules which help in that task. You cannot decide, well, this witness testified falsely in answer to this question and therefore everything else that he said was false, nor can you conclude that this witness answered truthfully as to this question and therefore every other answer that he gave was true. That is the great and the difficult problem and the awful responsibility that any juror or any judge undertakes when he undertakes to be a judge of his fellow man.

"Now, I do not believe everything that Mr. Rosenbaum said, and I do not believe everything that Mr. Schott said. I am highly suspicious of Mr. Rosenbaum. I thought Mr. Rosenbaum was far from candid. Mr. Rosenbaum couched most of his answers with the phrase, 'Not as far as I know.', and he answered questions which he should have known with that same evasive phrase. I agree with the prosecution that the circumstances concerning the obtaining of the $87,000. fee, for what I am unable to understand, whether it was legal advise that an engineering company was giving Merritt-Chapman & Scott, or not. I agree with the prosecution that the circumstances as explained in this courtroom are highly suspicious. I agree with the prosecution that the circumstances of giving of the diamond drilling contract to the so called McLean Engineering Company are even more suspicious, and I agree with the prosecution that the fact that one-half of the $6,500. fee in connection with the voting machines, one-half of which found its way into Mr. Smothers pocket through a corporation which was formerly wholly owned by Merritt-Chapman & Scott and which is now headed by a former vice president of that company, is also highly suspicious. Those were the suspicions that were conveyed to this Grand Jury who were attempting to undertake the responsibility that the citizens of this community had placed upon it. And this Grand Jury was entitled to fair,

honest, candid and frank answers from the defendant in this case, and in my opinion they did not receive such answers.

"My conclusion is that the State has established the guilt of this defendant in every Count, beyond a reasonable doubt.

"This Court will stand adjourned."

Before signing the judgment and sentence (April 18, 1960), the trial court (March 23, 1960) had entered detailed findings of fact which are set out in twelve pages of the transcript. Error is claimed in the entry of certain portions of these findings in appellant's assignment Nos. 96 to 120, inclusive.

Appellant took the stand in his defense and denied that he had testified falsely as to the matters described in the five counts of the indictment. The state's two principal witnesses had previously testified to the contrary as to the correctness of appellant's testimony before the grand jury.

The trial court, in a criminal case (where a jury has been waived), has the duty of evaluating the testimony of the various witnesses where there is a conflict and of making findings of fact. *Cf. State v. Mercy*, 55 Wn. (2d) 530, 348 P. (2d) 978 (1960). As in a civil case, our function is to determine whether there was substantial evidence to support the findings which are challenged in appellant's assignments of error. If so, we must accept the findings as verities. *Ostiguy v. A. F. Franke Constr., Inc.*, 55 Wn. (2d) 350, 347 P. (2d) 1049 (1959); *Stewart v. Smith*, 55 Wn. (2d) 563, 348 P. (2d) 970 (1960).

In our discussion of appellant's 123 assignments of error, we shall group them, for the most part, in the same manner as they are argued in appellant's brief. In considering these assignments, we have in mind the rule that those that are not supported by argument in appellant's briefs will not be considered. See *Fulton v. Fulton*, 57 Wn. (2d) 331, 357 P. (2d) 169 (1960), and cases cited therein.

ASSIGNMENTS OF ERROR Nos. 1, 6, AND 7:

Following the citation of the statutory provisions defining the crime of first-degree perjury and the qualitative and quantitative proof required to support a conviction

thereof, and the citation of authorities relative thereto, appellant contends:

I. That the Grant County Superior Court erred in extending the term of the grand jury from 60 days to an indefinite period, because it lacked constitutional or statutory authority to do so. (We are not informed as to the basis for this alleged lack of authority and need not consider this contention.)

II. That it was error to deny appellant's motions to set aside and to quash the indictment. Apparently, the common thread to the three arguments advanced in support of the above proposition is that the grand jury had no authority to issue an indictment against appellant.

1. Appellant first contends that the court abused its discretion in the selection of the grand jury in that the court did not adhere to uniform standards, and that the standards used were not uniformly applied, but that some jurors were arbitrarily chosen or excused. It is argued that certain named jurors had preconceived opinions on matters to be investigated and expressed them in the presence of other prospective jurors.

It should be borne in mind that appellant was not referred to, either by name or by the remotest implication, in the proceedings for the impanelment of the grand jury. There is nothing in the record of these proceedings to indicate that the presiding judge, the prosecuting attorney, or the prospective jurors had at that time the slightest idea that appellant had any connection with any of the matters to be investigated. Under these circumstances, we do not think that appellant has any standing to complain about the selection of the grand jurors, unless he can show that the provisions of RCW 10.28.030 and .040 were applicable to this impanelment. Since there is nothing in the record to indicate that appellant was, at the time that the grand jury was being impaneled, under the slightest suspicion of being a person whose conduct was to be scrutinized by the grand jury, he may not be heard to attack the court's exercise of its discretion in the selection of the grand jurors.

2. The second contention relates to the validity of the appointment of Mr. Riner E. Deglow, a resident of Spokane, who is duly admitted to practice law in this state, as a special deputy prosecuting attorney of Grant County. Mr. Deglow first appeared before the grand jury in his capacity as special deputy on April 6, 1959 (some eight months after it had been impaneled and five months after appellant had testified before it the first time).

It is argued that Mr. Deglow was not eligible for appointment because he was a nonresident of Grant County. The basis of this contention is that, prior to 1959, the pertinent statute (RCW 36.27.040) provided that the prosecuting attorney's choice of such deputy should be limited to practicing lawyers residing in his own county. In 1959, the legislature amended the statute by eliminating this restriction and permitting the appointment of any resident of this state who was admitted to practice as attorney before the courts of this state. Section 2 of the amendatory act contained an emergency clause, reading:

"This act is necessary for the immediate preservation of the public peace, health and safety, the support of the state government and its existing public institutions, and shall take effect immediately." Laws of 1959, chapter 30, § 2.

This act was signed by the governor February 18, 1959, and became effective immediately, unless, as appellant argues, the emergency clause was invalid.

In this connection, appellant cites several of our decisions in which we have considered the validity of emergency clauses in statutes. Our attention is called to *State ex rel. Pennock v. Coe*, 42 Wn. (2d) 569, 257 P. (2d) 190 (1953), in which this court (*en banc*) reviewed our former cases on this subject. It is to be noted that this court has never before been asked to pass on the validity of an emergency clause except in a proceeding instituted by a person or group of persons who were attempting to exercise the constitutional right of referendum under paragraph (b) of the seventh amendment to our state constitution.

■■ In the present case, there is no showing that appellant or any one else had ever attempted to file a referen-

dum petition with the Secretary of State. Appellant has no standing to attack the good faith of the legislature in attaching an emergency clause to chapter 30 of the Laws of 1959, because he has no vested interest in any particular form of criminal procedure. Furthermore, whether a lawyer from Spokane County or from Grant County was appointed as special deputy prosecuting attorney (if his appointment had been validly authorized by the legislature) is no concern of appellant's because he has not shown that he was prejudiced in any way by Mr. Deglow's appointment.

His only concern is whether an unauthorized person was present in the grand jury room on and after April 6, 1959. Even if the emergency clause were invalid, the 1959 act would have become effective June 10, 1959, which was several months before his indictment. Hence, in any event, Mr. Deglow would have had authority to be in the grand jury room in June, if not in April. The practical effect on appellant's rights resulting from the legislature's advancing the date of Mr. Deglow's eligibility to act as a special prosecutor seems to us to be negligible. Even assuming that appellant had any standing to attack the validity of the emergency clause, the burden would be on him to show bad faith on the part of the legislature in declaring an emergency. *State ex rel. Pennock v. Coe, supra.* Here we have only appellant's bald assertion that no emergency in fact existed.

We hold that, under the circumstances, this contention is not available to appellant and, even if it were, it has no merit.

3. In his third and final argument supporting his theory that there was no authority to issue an indictment, appellant claims that the grand jury indictment is vitiated by the disclosure of a part of the Grant County grand jury proceedings to an assistant district attorney in New York.

The disclosure came about when the prosecuting attorney sought to have Robert E. Harvey, the president of MCS, subpoenaed under the Uniform Witness Act (RCW 10.55) from New York to Grant County to appear before

the grand jury. Harvey decided to contest the validity of the proceedings in the New York courts. This challenge had to be met, and the materiality of Harvey's testimony shown, or the New York court would be powerless to issue the subpoena. See *Application of Stamler*, 279 App. Div. 908, 111 N. Y. S. (2d) 313. At that point, the prosecuting attorney of Grant County was faced with a choice—disclose a part of what had gone on before the grand jury, in order to give the New York assistant district attorney some facts showing materiality of Harvey's testimony, or abandon the Uniform Witness Act with regard to obtaining witnesses before the grand jury.

The Uniform Witness Act provides, by its terms, for the attendance of witnesses before grand jury investigations. That statute was enacted after the requirement for secrecy of grand jury proceedings had long been part of our law. If possible, the court must harmonize statutes relating to the same subject, and give effect to each. *State ex rel. Reed v. Spanaway Water Dist.*, 38 Wn. (2d) 393, 229 P. (2d) 532 (1951), and *State v. Fairbanks*, 25 Wn. (2d) 686, 171 P. (2d) 845 (1946). Under these circumstances, we hold that the later act (the Uniform Witness Act) provides authority for the disclosure made in this case.

However, even if the disclosure were unauthorized, appellant would have no grounds for setting aside the indictment, unless he could show that he was prejudiced by the disclosure. *United States v. Amazon Industrial Chemical Corp.*, 55 F. (2d) 254, 261 (1931). Appellant has alleged no facts whatsoever to show any injury in any degree to any of his rights because of the prosecutor's action.

We find no merit in the contention that it was error not to set aside the indictment because of the disclosures that were made to the assistant district attorney in New York.

Therefore, all of the arguments by appellant in support of assignments of error Nos. 1, 6, and 7 have failed.

ASSIGNMENTS OF ERROR NOS. 3, 4, 5, 8, 9, AND 10:

Appellant asserts that his motion to strike the indictment and his motion for a bill of particulars were erroneously denied.

■ We find no merit in this assignment because these matters were for the trial court to grant or deny in its discretion, and we cannot say that there was any abuse of its discretion. Appellant was furnished with a complete copy of his grand jury testimony well in advance of the trial. The indictment fully informed appellant as to the offense with which he was charged. Not only were the elements of perjury alleged, but the alleged falsehoods were quoted verbatim. Furthermore, the indictment pointed out quite specifically the material business of the grand jury to which the statements related.

ASSIGNMENT No. 2:

It is asserted that it was also error to deny appellant's motion to inspect the grand jury proceedings and minutes relating to his testimony. Appellant complains that the state took full advantage of the undefined language of the indictment and gained admission for a flood of evidence not specifically alleged therein nor logically by inference tending to prove any part of the offense charged. (As above stated, appellant was subsequently furnished all of his own testimony several months before trial.)

■ No argument is made in appellant's briefs in support of this assignment beyond two page references to the statement of facts. Thus we are invited to search the record to see if we can find support for this assignment. In other similar situations, we have declined to do so. *Fulton v. Fulton*, 57 Wn. (2d) 331, 357 P. (2d) 169 (1960), and cases cited therein.

ASSIGNMENTS Nos. 37, 38, AND 49:

■ In these assignments, appellant complains concerning the testimony presented by the state and admitted over appellant's objection tending to show that appellant's testimony tended to hinder and delay the grand jury's investigation. The foreman and three other members of the grand jury testified that the grand jury had concluded that additional investigation was necessitated because of Bell's testimony. The trial court correctly treated that as a statement of fact and not an opinion. These assignments have no merit.

ASSIGNMENTS Nos. 11, 13, 14, 15, 19, 20, AND 29:

These assignments relate to a corporation known as Agencia Industrial which was incorporated under the laws of the Dominican Republic. Briefly stated, the testimony of appellant before the grand jury relating to this incident was that, in 1956, he by chance encountered a stranger who offered him some stock in this corporation for $500. He purchased the stock and sold a one-half interest in the "flyer" to Smothers for $250. "Later," he received a telephone call from a different stranger in Washington, D. C. to the effect that certain other stockholders, who wished to obtain control of the corporation, would pay appellant $5,000 for his stock. Accordingly, when he sold his stock for this sum he gave Smothers one half of the proceeds of the sale.

Appellant complains that his testimony before the grand jury pertaining to this transaction was read into the record at the trial over his objection, although it referred to a source of income not mentioned in the indictment and, also, that his motion to strike it was denied. He further argues that the trial court relied on it in its oral decision.

The state points out in answer to this contention that appellant's check for $500, payable to the corporation, was admitted without objection, as was the check for $5,000, payable to appellant and purportedly endorsed by the stranger. At the trial, there was testimony that the endorsement was by Frank Rosenbaum, who was a partner in a law firm practicing in Washington, D. C., some of whose partners were incorporators and officers of the Dominican corporation. Several of them were personal friends of appellant of many years' standing. (These same persons also controlled McLean at that time, as pointed out previously.)

In the state's brief, it is contended that the Dominican corporation matter was introduced to show:

". . . (1) the materiality of the Grand Jury proceedings; (2) the nature of the defendant's testimony as an indication of wilfullness, and corruptness of intent and (3) scheme, design and plan, since it is obvious that the defendant was not truthful concerning this transaction.

"To take certain statements out of context would deprive the trier of the fact of the opportunity to examine the defendant's testimony on November 5th as a whole. The State contends that an appraisal of the defendant's entire testimony as of that date could have probative value to determine whether or not any of the defendant's testimony on that date was wilful, corrupt, felonious, material and false.

"The defendant's testimony on November 5th, including Agencia, was primarily concerned with payments of money, which he split with Smothers, during the MCS contract, which except for the voting machine transaction, all had a connection with the Rosenbaums, who, in turn, had a connection with MCS concerning the Priest Rapids Project."

For the reasons given by the state, we find no merit in these assignments.

Furthermore, if the evidence referred to were not material, the following portion of our opinion in *State ex rel. Cummings v. Kinne*, 8 Wn. (2d) 1, 111 P. (2d) 222 (1941), would be applicable to this case:

"Appellant assigns error upon the admission of considerable evidence, over her objection. As to most of this evidence, she contends that it related to her habits and conduct at a period too remote from the time of trial to render such evidence material. In such a case as this, such evidence is admissible, the weight which the court should attach thereto to be determined in the exercise of sound judicial discretion. It should be assumed that any evidence which was introduced concerning immaterial matters was disregarded by the trial court, and most of the evidence, whether oral or by way of exhibits, of the admission of which appellant complains, was properly admitted. Of course, this court disregards any evidence which was improperly admitted. We find no error in connection with these assignments of error."

Assignments Nos. 2 and 16:

Under these two assignments, appellant makes a general complaint that, while he was denied access to the grand jury proceedings, the state, on the vital issue of materiality, was allowed (over his objection that they were opinions, conclusions, hearsay, and not the best evidence) portions

of the proceedings and testimony relative to the grand jury and its opinions.

Here, again, we are given references to the record, but are not favored with any argument in support of these assignments. As we said above regarding assignment No. 2, we must disregard such bare claims of error.

ASSIGNMENT No. 21:

Appellant claims that the trial court erred in admitting his entire testimony of March 13, 1959, before the grand jury (which was not the basis of the perjury charge), on the theory that it showed subsequent inconsistent statements with his November 5, 1958 testimony, without requiring the state to point out the alleged inconsistent statements therein. He contends that this shifted to him the burden of explaining portions thereof which were not in issue before the grand jury when he first testified.

The state argues that appellant's entire testimony of March 13, 1959, could have been of great significance to the trier of the fact in understanding his alleged perjured testimony of November 5, 1958.

It seems to us that the admission of appellant's subsequent testimony was a matter within the trial court's discretion. As to the purpose for which the court gave it consideration, we must assume that, in a trial to the court without a jury, the trial court did not consider immaterial evidence in reaching his decision. See *Davis v. Seattle*, 134 Wash. 1, 235 Pac. 4, 44 A. L. R. 1490 (1925); *Kemp v. Putnam*, 47 Wn. (2d) 530, 288 P. (2d) 837 (1955).

There was no reversible error in the admission or use of the testimony complained of.

ASSIGNMENT No. 22:

This has reference to the trial court's refusal to strike all testimony concerning the McLean corporation, except the New York McLean corporation. We need not set out the history of this corporation and its changes in name other than stating that it was organized as a Delaware corporation with its principal office in Washington, D. C. at the same address as the law firm heretofore mentioned.

Later, it qualified to do business in New York and moved its principal office to 341 Madison Avenue, New York City, and changed its name.

Appellant argues that since it was not mentioned in the indictment under its original name, no claim was made by the state that appellant testified falsely regarding it while its principal office was in Washington, D. C.

The state's answer to this assignment is that the testimony was necessary in order that the court could understand the entire circumstances relating to the grand jury investigation and appellant's testimony of November 5, 1958.

Since the so-called New York McLean and the Washington McLean were one and the same corporation (regardless of who the officers and stockholders were), we cannot hold that the trial court abused its discretion in denying the motion to strike.

ASSIGNMENT No. 12:

 Error is claimed in the admission in evidence of the court's charge to the grand jury when it was convened on August 25, 1958, because it had no bearing on the ultimate issue before the trial, to wit, was appellant's false testimony material to the matters being investigated by the grand jury?

The court's charge contained the following:

"It seems unnecessary to review the recent testimony heard before me, as Presiding Judge, requesting a grand jury investigation into the affairs of the Public Utility District of Grant County. The court does not wish to intimate in any way, as to whether or not you, as a grand jury, should issue an indictment. That will be up to you after an investigation has been made; you have heard the testimony of witnesses and conferred with the Prosecuting Attorney.

"As I stated previously, by law you are required to visit the county jail and make your report as herein set forth. Outside of that, I suggest to you that the scope of your inquiry into fields other than the Public Utility District of Grant County, be largely restricted to those matters suggested as worthwhile by the Prosecuting Attorney, who is a skilled and experienced Attorney, and always available

to you for advice. The court is also ready to consult with you on legal questions at any time.

"To completely investigate the Public Utility District of Grant County, may be beyond the endurance and energy of yourselves, the Prosecuting Attorney and his investigating staff. The financial burden of such a complete investigation may be beyond the resources of Grant County. I urge you to do all that you can within practical limitations, to ascertain the truth or falsity of these charges."

We think that the above-quoted portion of the charge had a pertinent bearing on the ultimate issue of materiality and that there was no prejudicial error in admitting the charge in evidence.

ASSIGNMENTS Nos. 74, 76, 98, 99, 100, 101, AND 102:

Appellant contends that findings of fact Nos. 6 through 10, inclusive, are based on the erroneous premise that Smothers "secretly" initiated the extra work order procedure.

In 1958, Mr. Nat Washington, who was then, and had been since 1951, general counsel for the PUD, wrote an opinion to the effect that the practice of the PUD entering into extra work orders with MCS (in excess of $5,000) without competitive bidding was illegal as being in violation of RCW 54.04.070.

Mr. Washington was the first witness before the grand jury. Appellant was furnished with a copy of Mr. Washington's testimony, but no effort was made to refute the fact that Mr. Washington expressed his legal opinion to the grand jury that the extra work orders without public bidding were illegal.

Appellant complains that Smothers did not secretly initiate this practice, but that the Harza Engineering Company did so. Appellant offered to prove this fact, but the trial court declined to receive it. This was not error, because the principal issue was not whether Smothers or Harza originated the practice or whether Mr. Washington's legal opinion was correct, but what Mr. Washington testified before the grand jury about his opinion on this subject.

The findings concerning which appellant complains did

not contain what he claims they did. The court found that Mr. Washington had no knowledge concerning this matter until early in 1958. The findings are confined solely to what testimony was submitted to the grand jury relative to extra work orders.

ASSIGNMENTS NOS. 23, 24, 25, 26, and 78:

These relate to the payment of $6,500 by the Shoup Voting Machine Company to appellant. Lewis M. Schott, president of the company, testified regarding this transaction. He testified that he had also testified before the grand jury to the same effect. The trial court did not abuse its discretion in refusing appellant's request for all of Schott's testimony before that body (at the time of the trial the grand jury was still in session), although the trial court's ruling was based on the theory that Schott was a personal friend of appellant's and had no adverse interest.

ASSIGNMENTS NOS. 27, 28, 33, 35, 39, 40, 41, 42, 43, 45, 46, 47, 48, AND 85.

██ These relate principally to the Lynch-McClintock subcontract with MCS for drilling work at the dam site, which was obtained by McLean corporation. The latter received more than $100,000 from Lynch-McClintock for this service. This transaction is described in finding No. 27 (subparagraphs F and G), and the evidence regarding it was admitted as bearing on the issue of materiality of appellant's testimony before the grand jury. While neither appellant nor the grand jury were aware of this transaction on November 5, 1958, there was no prejudicial error in admitting the evidence, because it was a subject which the grand jury was interested in investigating. It is no defense that appellant did not know that his false statements were material.

The other claimed errors covered in the above assignments do not require separate discussion. As we have previously pointed out, where a case is tried to the court without a jury, it will be presumed that the trial judge disregarded inadmissible testimony in reaching his decision

where there is competent testimony to sustain his findings. *Kemp v. Putnam, supra.*

THE REMAINING ASSIGNMENTS, LESS 96 THROUGH 123:

All of these assignments, like several previously discussed, relate to the admission of evidence. Assignments 27, 28, 30, 31, and 32 all label Rosenbaum's testimony hearsay. Assignments 17, 18, 34, and 51 to 64, inclusive, are all based on the argument that the testimony relating to English Electric was irrelevant, "clearly inadmissible," and prejudicial. Assignment 66 attached a hearsay, irrelevant, and immaterial label to documentary proof of a $1 million extra work order. Appellant sought to support assignments 69, 70, 71, 77, 79-84, 87, and 88 by calling certain exhibits irrelevant, self-serving, and hearsay (the exhibits concerned work done by the prosecutor's office after November 5, 1958). In support of the other assignments under this heading, appellant goes so far as to challenge the credibility of a witness, assert that the appellant was confined to the best evidence rule whereas the state was not, and complain about the insufficiency of cross-examination allowed to appellant against a particular witness.

It would be possible to go through each of these assignments of error and show that none of these assertions are true, that the standards applied to both parties were entirely consistent, that each bit of challenged evidence would have been admissible even in a trial before a jury, and that the judge did not abuse his discretion in any single instance. However, it is unnecessary to go through such a labored process when the trial was to a court sitting without a jury.

In such a case, we must first consider the liberal admissibility policy which this state has adopted, which was first set forth in 1907, in the case of *Degginger v. Martin,* 48 Wash. 1, 92 Pac. 674 (1907):

"The appellant has contended that the trial court erred in refusing to admit certain evidence offered by her. We find no prejudicial error in this regard, but in view of a new trial, we will suggest that, while the court in an action tried without a jury should reject all evidence clearly in-

competent and immaterial, to avoid encumbering the record, yet a liberal practice should be adopted in admitting evidence so that this court, in the event of an appeal, will on a trial *de novo* have all material facts before it for consideration, and thus avoid the necessity of the cause being remanded for the admission of material evidence erroneously rejected."

Not only do we encourage liberal admission of evidence in nonjury trials, but that policy is furthered by the presumption on appeal (which has been mentioned several times already) that:

". . . Since there is no affirmative evidence to the contrary, we must presume that the trial judge, knowing the rules of evidence, did not consider matters which were inadmissible when making his findings. *Kemp v. Putnam*, 47 Wn. (2d) 530, 288 P. (2d) 837 (1955); *Walker v. Herke*, 20 Wn. (2d) 239, 147 P. (2d) 255 (1944); *Whiting v. Seattle*, 144 Wash. 668, 258 Pac. 824 (1927)." *Davis v. Sill*, 55 Wn. (2d) 477, 480, 348 P. (2d) 215.

See, also, *State v. Ryan*, 48 Wn. (2d) 304, 308, 293 P. (2d) 399 (1956):

"Where a case is heard by a judge without a jury, a new trial should not be granted for error in the admission of evidence, if there remains substantial admissible evidence to support the findings, unless it appears that the findings are based on the evidence which should have been excluded. . . ."

See, also, *State ex rel. Cummings v. Kinne, supra*, and *Davis v. Seattle, supra*.

In the present case there is no indication that any of the evidence was used for an improper purpose. We hold that there was no reversible error in the admission of evidence.

ASSIGNMENTS NOS. 96 TO 120, INCLUSIVE:

All of these assignments challenge particular findings of fact. There is substantial admissible evidence in the record to support each of the findings of fact. Therefore, they will be treated as verities. *Stringfellow v. Stringfellow*, 56 Wn. (2d) 957, 350 P. (2d) 1003, 353 P. (2d) 671 (1960); *In re Bailey's Estate*, 56 Wn. (2d) 623, 354 P. (2d) 920 (1960); *Gooden v. Hunter*, 56 Wn. (2d) 617, 355 P. (2d) 20 (1960);

*Mack v. Eldorado Water Dist.*, 56 Wn. (2d) 584, 354 P. (2d) 917 (1960).

ASSIGNMENTS NOS. 121 TO 123, INCLUSIVE:

The last assignments of error attack the conclusions of law and the judgment of the trial court. The findings of fact support the conclusions of law and judgment.

There being no merit in any of the 123 assignments of error, we are of the opinion that appellant had a fair trial, and that the judgment is in all respects a proper one. The judgment of the trial court is hereby affirmed.

FINLEY, C. J., MALLERY, HILL, WEAVER, ROSELLINI, OTT, and FOSTER, JJ., concur.

HUNTER, J., did not participate.

March 26, 1962. Petition for rehearing denied.