[No. 27037-8-III.   Division Three.   December 17, 2009.]

DARLENE L. TURNER ET AL., *Respondents*, v. NATHAN P. STIME ET AL., *Appellants*.

incarcerated. Thus, we limit our review to addressing whether Pugh's standby counsel provided ineffective assistance.

582

*Mary H. Spillane* and *Daniel W. Ferm* (of *Williams Kastner & Gibbs PLLC*); and *Brian T. Rekofke*, for appellants.

*Mark D. Kamitomo* (of *The Markam Group Inc.*), for respondents.

*Shaakirrah R. Sanders, Sarah A. Dunne*, and *Nancy Lynn Talner* on behalf of the American Civil Liberties Union of Washington, Columbia Legal Services, the Korean American Bar Association, the Latino/a Bar Association of Washington, the Loren Miller Bar Association, the Middle Eastern Legal Association of Washington, the Northwest Indian Bar Association, and the Vietnamese American Bar Association of Washington, amici curiae.

*Lorraine K. Bannai, Keith A. Talbot*, and *Suchi Sharma* on behalf of the Asian Bar Association of Washington, the Fred T. Korematsu Center for Law and Equality, the South Asian Bar Association of Washington, and Washington Women Lawyers, amici curiae.

*George M. Ahrend* and *Bryan P. Harnetiaux* on behalf of the Washington State Association for Justice Foundation, amicus curiae.

¶1 KULIK, A.C.J. — Darlene and Bill Turner sued Dr. Nathan Stime and Riverside Medical Clinic (collectively Dr. Stime) for medical malpractice. The jury returned a verdict for Dr. Stime. Two jurors then stated that during deliberations several jurors had referred to the Turners' attorney, who is of Japanese ancestry, as "Mr. Kamikaze," "Mr. Miyashi," "Mr. Miyagi," or "Mr. Havacoma." One juror also reportedly stated that the defense verdict was "almost appropriate" given that it was delivered on December 7, a reference to the day in 1941 when the Japanese attacked Pearl Harbor.

¶2 The trial court found juror misconduct that affected the verdict and granted the Turners' motion for a new trial. Dr. Stime appeals.

¶3 We hold that under *Gardner*,[1] the trial court properly granted a new trial when it determined there was sufficient misconduct to establish a reasonable doubt that the improper conduct affected the verdict and denied the Turners a fair trial. Accordingly, we affirm.

## FACTS

¶4 Darlene and Bill Turner sued Dr. Nathan Stime, a general practitioner, and his employer, Riverside Medical Clinic, for medical negligence. Ms. Turner alleged that on Monday, March 1, 2004, and on Wednesday, March 3, 2004, Dr. Stime violated the standard of care by failing to take an appropriate history and by failing to conduct an appropriate physical on Ms. Turner so that further testing or diagnostics might be performed to reveal that she had pneumonia instead of terminal cancer. The untreated pneumonia progressed to sepsis, resulting in Ms. Turner's hospitalization for approximately 45 days. During most of this time, Ms. Turner was in a coma. The sepsis resulted in the amputation of Ms. Turner's left forefoot.

¶5 At trial, the Turners were represented by attorney Mark Kamitomo, who is of Japanese ancestry. Dr. Stime was represented by attorney Brian Rekofke, who is Caucasian. Mr. Kamitomo was the only non-Caucasian involved in the trial.

¶6 Dr. Stime's witness, Dr. Timothy Chestnut, a pulmonologist, testified that Dr. Stime violated the standard of care in several ways during Ms. Turner's March 1 and March 3, 2004 appointments. Despite this testimony, the jury returned a defense verdict.

¶7 After the verdict was delivered, Jack Marchant, a juror, told Mr. Kamitomo that racial prejudice and bias had played a role in the jury's deliberations. Mr. Marchant's affidavit states that throughout the trial and the delibera-

---

[1] *Gardner v. Malone*, 60 Wn.2d 836, 376 P.2d.651, 379 P.2d 918 (1962).

tions process, three female jurors and two male jurors made racially based comments directed at Mr. Kamitomo. Mr. Marchant's affidavit also states that very early in the proceedings "three of the women jurors and two of the male jurors referred to Mr. Kamitomo as 'Mr. Kamikazi' or 'Mr. Miyashi' or 'Mr. Miyagi.' Additionally, two of the male jurors referred to Mr. Kamitomo as 'Mr. Kamikazi' and, once as 'Mr. Havacoma.' " Clerk's Papers (CP) at 76-77.

¶8 Another juror, Mark Costigan, confirmed the use of these names. He also stated that the comments occurred more than once. Mr. Costigan explained that these comments were made in a "racially derogatory" manner "demonstrating a bias or prejudice toward Mr. Kamitomo." CP at 109-10. Mr. Costigan also reported that a juror referenced December 7, Pearl Harbor Day, and stated the defense verdict was almost appropriate.

¶9 Mr. Costigan further stated that when a juror used the names of "Mr. Kamikazi" or "Mr. Miyashi" other jurors would chuckle and smirk at the names. CP at 309.

¶10 Dr. Stime submitted affidavits of jurors who admitted using alternative names for Mr. Kamitomo. Several jurors explained that they had trouble pronouncing Mr. Kamitomo's name and the name of defense counsel, Brian Rekofke. No jurors reported the use of an alternative name for Mr. Rekofke. Several jurors denied any bias in reaching the verdict. Eight jurors stated that they never referred to Mr. Kamitomo in racially derogatory terms and that they had not heard or witnessed anything suggesting bias. These eight jurors also stated that they did not hear or witness anything causing them to believe that any juror's vote was not based solely on the evidence.

¶11 The court granted the Turners' motion for a new trial. In its written findings of fact and conclusions of law, the court found that the jurors' reference to Mr. Kamitomo as "Mr. Kamikaze," "Mr. Miyashi," or "Mr. Miyagi" constituted a "bastardization" of Mr. Kamitomo's name that was "racially motivated reflecting a reasonable concern as to the objectivity of the jurors." CP at 546. The court concluded

that these names were "undeniably derogatory comments . . . of some prejudice to Mr. Kamitomo's ethnicity" and that the names "adversely affected the verdict in some fashion." CP at 547. The court also found that the juror's comment that the verdict was almost appropriate because it was rendered on December 7 was "a clear indication that racial bias against Mr. Kamitomo's Japanese ancestry was entertained." CP at 546.

¶12 Finally, the court concluded that juror misconduct in the form of racial bias toward Mr. Kamitomo had been established. The court ruled that it was reasonably likely that the improper conduct affected the jurors' objective analysis of the material issues in the case and, thus, the verdict should be set aside.

¶13 Dr. Stime appeals the grant of a new trial.

## ANALYSIS

¶14 *Motion for a New Trial.* When an aggrieved party brings a motion for a new trial, the court has the authority to vacate the verdict and grant a new trial based on misconduct. *See* CR 59(a)(2). Here, the trial court ordered a new trial based on juror misconduct. The trial court found it had no confidence that "the jury's verdict was based upon the Court's proper legal instructions and the jury's unbiased analysis of the facts." CP at 548.

¶15 "The right to trial by jury includes the right to an unbiased and unprejudiced jury, and a trial by a jury, one or more of whose members is biased or prejudiced, is not a constitutional trial." *Alexson v. Pierce County*, 186 Wash. 188, 193, 57 P.2d 318 (1936). And a trial court has significant discretion to determine what investigation is necessary on a claim of juror misconduct. *United States v. Villar*, 586 F.3d 76, 88 (1st Cir. 2009) (quoting *United States v. Mikutowicz*, 365 F.3d 65, 74 (1st Cir. 2004)).

¶16 Dr. Stime argues that the applicable standard of review is de novo because the court's decision was based on declarations, affidavits, and written documents, not live testimony. To support this argument, Dr. Stime relies on *In re Estate of Bowers*, 132 Wn. App. 334, 131 P.3d 916 (2006),

and *In re Estate of Nelson*, 85 Wn.2d 602, 537 P.2d 765 (1975). However, both of these cases involved probate proceedings, not motions for a new trial. A decision on a motion for a new trial must be based upon " 'a consideration of the whole of the pertinent record.' " *Gardner*, 60 Wn.2d at 846 (internal quotation marks omitted) (quoting *Lyberg v. Holz*, 145 Wash. 316, 259 P. 1087 (1927)). The findings here were based on the trial court's presence during the multiday trial. The review was not based merely on declarations, affidavits, and written documents as is asserted by Dr. Stime.

¶17 The standard of review of this court is abuse of discretion, not de novo. *Id.* A court abuses its discretion when the court's decision is manifestly unreasonable or based on untenable grounds. *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997). Applying *Gardner*, this court must determine whether the trial court abused its discretion by deciding that there was "sufficient misconduct to establish a 'reasonable doubt' that plaintiff was denied a fair trial." *Gardner*, 60 Wn.2d at 847.

¶18 *Evidence of Juror Misconduct*. It is undisputed here that the words "Mr. Kamikaze," "Mr. Miyashi," and "Mr. Miyagi" were used by jurors in reference to Mr. Kamitomo. There is also no dispute that the Pearl Harbor comment was made, although Dr. Stime characterizes the context differently than Ms. Turner. Mr. Marchant's affidavit states that three of the women jurors and two of the male jurors referred to Mr. Kamitomo as "Mr. Kamikazi," "Mr. Miyashi," or "Mr. Miyagi." Mr. Marchant stated that two of the male jurors referred to Mr. Kamitomo as "Mr. Kamikazi" and once as "Mr. Havacoma." CP at 76-77.

¶19 Mr. Costigan stated that the comments occurred more than once and that

> [f]inally, on December 7, 2007, which was the date the verdict was rendered, after one of the racially derogatory comments [was] made, one of the jurors made the statement that given that it was December 7[th], the racially derogatory remark was "almost appropriate."

CP at 110.

¶20 Mr. Costigan later stated that when jurors used the names "Mr. Kamikazi" or "Mr. Miyashi," they would also chuckle or smirk at the derogatory names. CP at 309.

¶21 No one denied that the racially based comments were made. In fact, some jurors admitted using these names for Mr. Kamitomo. Several jurors stated that they had trouble pronouncing Mr. Kamitomo's name as well as the name of defense counsel, Mr. Rekofke. But no one reported that any alternative names were used for Mr. Rekofke, who is Caucasian, as opposed to Mr. Kamitomo, who is of Japanese ancestry.

■ ■ ¶22 When determining whether misconduct occurred, the trial court must consider whether the alleged conduct inheres in the verdict. *Gardner*, 60 Wn.2d at 839-40. If the conduct does not inhere in the verdict, the conduct may be considered by the court. *Id.* at 841. If the conduct inheres in the verdict, the conduct cannot be considered. Whether conduct inheres in the verdict is a question of law, reviewed de novo. *See Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747, 768, 818 P.2d 1337 (1991).

¶23 The rule for determining whether conduct inheres in the verdict is explained as follows:

". . . In considering the affidavits filed, we entirely discard those portions which may tend to impeach the verdict of the jurors, and consider only those facts stated in relation to misconduct of the juror, and which in no way inhere in the verdict itself. It is not for the juror to say what effect the remarks may have had upon his verdict, but he may state facts, and from them the court will determine what was the probable effect upon the verdict. *It is for the court to say whether the remarks made by the juror in this case probably had a prejudicial effect upon the minds of the other jurors.*"

*Gardner*, 60 Wn.2d at 840 (emphasis added) (alteration in original) (quoting *State v. Parker*, 25 Wash. 405, 415, 65 P. 776 (1901)).

■ ¶24 *Gardner* explains other tests for determining whether a juror's testimony inheres in the verdict:

One test is whether the facts alleged are linked to the juror's motive, intent, or belief, or describe their effect upon him; if so, the statements cannot be considered for they inhere in the verdict and impeach it. If they do not, it then becomes a matter of law for the trial court to decide the effect the proved misconduct could have had upon the jury. Another test is whether that to which the juror testifies can be rebutted by other testimony without probing a juror's mental processes.

*Id.* at 841.

¶25 Significantly, misconduct does not inhere in the verdict where the juror makes racially based statements that are factual in character. *City of Seattle v. Jackson*, 70 Wn.2d 733, 738-39, 425 P.2d 385 (1967). In *Jackson*, an African American defendant was found guilty of willfully and unlawfully causing a loud and disturbing noise. *Id.* at 734. The Washington Supreme Court considered the trial court's *denial* of a motion for a new trial. The juror stated, " 'I also heard some discussion of the Watts incident in California during which the statement was made that we did not want a similar incident to happen in our city.' " *Id.* at 739. The court concluded that a new trial was not warranted because this factual statement was too general to reveal any racial prejudice against African Americans in general or the defendant in particular. *Id.*

¶26 Unlike *Jackson*, here the racially based words, along with the Pearl Harbor statement, reveal racial bias against Mr. Kamitomo in particular. Moreover, Mr. Marchant's and Mr. Costigan's affidavits contain facts that are not linked to juror motive, intent, or belief. Significantly, their statements about the use of "Miyagi," "Miyashi," and "Kamikaze," and the Pearl Harbor comment are capable of objective proof without an examination of the jurors' thought processes. Mr. Costigan's statement concerning the chuckling and smirking of some jurors is also capable of objective proof. Accordingly, all of these facts were properly considered by the trial court.

¶27 Mr. Marchant's and Mr. Costigan's affidavits also contained some information that was linked to jurors'

mental processes rather than objective facts. For example, Mr. Costigan stated:

I believe that the jurors' bias toward Mr. Kamitomo influenced how they looked at the case. . . . Finally, one of the female jurors from the outset of the deliberations made it clear that she was very opposed to smoking and that because Mrs. Turner had smoked, this juror believed Mrs. Turner's injury was already present when Mrs. Turner saw Dr. Stime or likely to occur shortly. Her refusal to look at the case objectively led me to believe that the comments she had made of a racial nature were reflected in her lack of objectivity.

. . . .

. . . [I]t was apparent to me that the jurors' comments were the result of a knowing form of disrespect or bias, which reflected a lack of objectivity by the jurors in their deliberation.

CP at 110.

¶28 Despite the fact that such comments were included in the jurors' affidavits, it does not appear that the court relied on them in making its decision. In its findings, the court summarized the affidavit presented by the Turners describing Mr. Marchant's and Mr. Costigan's affidavits, in part, as follows:

Both Mr. Marchant and Mr. Costigan further stated the comments were made more than once and conveyed in a manner that [led] both the jurors to conclude that the comments were racially motivated with the jurors demonstrating a prejudice toward Mr. Kamitomo thereby affecting the objectivity of the jurors in the deliberations of the medical negligence issues.

CP at 545.

¶29 However, when the court set forth its findings, it stated only objective facts relating to the names, their use, the Pearl Harbor comment, and the fact that there were no alternative names for Mr. Rekofke. Based on these findings, the court relied on admissible evidence when making its decision. And, absent a showing that the court relied on inadmissible evidence, we must assume that the trial court did not consider such evidence when making its findings. *See State v. Bell*, 59 Wn.2d 338, 365, 368 P.2d 177 (1962) (quoting *Davis v. Sill*, 55 Wn.2d 477, 480, 348 P.2d 215 (1960)).

.

¶30 _Racial Bias_. Dr. Stime contends there is insufficient evidence to support the court's finding that "juror misconduct has been shown in the form of racial bias toward Plaintiffs' counsel Mr. Kamitomo and that such bias affected the objective deliberation of the case by the jurors." CP at 548.

¶31 We review the trial court's findings and conclusions to determine whether substantial evidence supports the findings of fact and, in turn, whether the findings support the conclusions of law. _Pilcher v. Dep't of Revenue_, 112 Wn. App. 428, 435, 49 P.3d 947 (2002) (quoting _In re Contested Election of Schoessler_, 140 Wn.2d 368, 385, 998 P.2d 818 (2000)). The substantial evidence standard requires that there be a sufficient quantum of evidence in the record to persuade a reasonable person that a finding of fact is true. If substantial evidence supports a finding of fact, we do not substitute our judgment for the trial court's. _Sunnyside Valley Irrigation Dist. v. Dickie_, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003).

¶32 The names "Kamikazi," "Miyashi," and "Miyagi" are racially based. Mr. Kamitomo was the only person of Japanese ancestry involved in the trial, and these names would not have been used to refer to a Hispanic American, an African American, or a Caucasian.

¶33 These words are Asian-sounding but do not derive from a mistaken pronunciation of Mr. Kamitomo's name. And no one reported that any alternative names were used for Mr. Rekofke, even though jurors found his name difficult to pronounce. Mr. Costigan stated that when jurors used the names "Mr. Kamikazi" or "Mr. Miyashi," they would chuckle or smirk. More importantly, after hearing a racially based name in reference to Mr. Kamitomo, a juror made a comment about the attack on Pearl Harbor, linking Mr. Kamitomo to the defense verdict. Unlike _Jackson_, here, there was evidence that racially biased words were aimed at Mr. Kamitomo in particular.

¶34 Based on this record, there is sufficient evidence to persuade a reasonable person that juror misconduct had been established in the form of racial bias toward Mr. Kamitomo.

¶35 *Effect on the Verdict*. The trial court concluded that it is reasonably likely that the improper conduct "affected the objective deliberation of the case." CP at 548. Dr. Stime argues that there is no evidence that any juror's attitude toward Mr. Kamitomo affected the verdict.

¶36 But *Gardner* asked whether there was sufficient misconduct to establish a reasonable doubt that the plaintiff was denied a fair trial. *Gardner*, 60 Wn.2d at 847. The trial court did not abuse its discretion by concluding that it was reasonably likely that the improper conduct affected the objective deliberation of the case. In light of the defense verdict and the words used by the jurors—"Kamikaze," "Miyashi," and "Miyagi"—as well as the comment about Pearl Harbor, there is a reasonable doubt that the misconduct denied the Turners a fair trial.

¶37 Dr. Stime argues that the words used by the jurors are not inherently derogatory. Dr. Stime suggests that the words "Kamikaze" and "Miyashi" are complimentary. But we do not consider the grant of a new trial based on only these words. Here, the Pearl Harbor comment and the defense verdict place these words in context and raise a reasonable doubt that the Turners were denied a fair trial.

¶38 Dr. Stime also asks this court to rewrite Washington law and hold that the misconduct must involve the clients rather than an attorney. Dr. Stime argues that even if the words were used by the jury, there is no proof that the words aimed at Mr. Kamitomo caused the jurors to unfairly weigh the evidence against his client. Dr. Stime points out that none of the cases cited by either side involve a situation where the juror misconduct was aimed at legal counsel.

¶39 In Washington, the *Gardner* standard is applied on a case-by-case basis. Based on this record, there is a reasonable doubt as to whether the words directed at Mr. Kamitomo affected the verdict and denied the Turners a fair trial. First, one or more jurors referred to Mr. Kamitomo as "Mr. Havacoma." This name demonstrates that jurors associated Mr. Kamitomo closely with his client,

Ms. Turner, who was in a coma for many of the 45 days of her hospitalization. Second, the Pearl Harbor comment related to the jury verdict demonstrates that the defense verdict against the Turners was closely associated with Mr. Kamitomo. Third, the very reasons for the attorney-client relationship require a close association between the lawyer and his or her client. The lawyer is the client's representative, with the responsibility to "conscientiously and ardently assert[ ] the client's position under the rules of the adversary system." RPC pmbl. 2. Moreover, the lawyer has the authority to speak for and bind the client in any legal proceedings. *See* RCW 2.44.010.

¶40 Lastly, Dr. Stime argues that this court should not encourage litigants to seek out flippant and insensitive remarks by jurors that can be recast as ethnic or other stereotyping capable of supporting a new trial. Dr. Stime asserts that if this case is not reversed, it will take only one juror to obtain a new trial. But this is not the law. A new trial will not be granted unless there is a reasonable doubt that the misconduct denied the Turners a fair trial. Hence, despite the manner in which the words are presented, the trial court, not the litigants, must determine whether misconduct occurred and whether there is a reasonable doubt as to whether the Turners were denied a fair trial.

¶41 *Requests for Rulings*. The Turners ask us to make various evidentiary rulings on issues that may be raised again in the new trial. This court will not attempt to anticipate how evidence will unfold on retrial. These matters should be addressed by the trial court.

¶42 We affirm the grant of a new trial.

SWEENEY and BROWN, JJ., concur.