**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
OCTOBER 20, 2022

_González C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
OCTOBER 20, 2022

ERIN L. LENNON
SUPREME COURT CLERK

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JANELLE HENDERSON, | ) | No. 97672-4 |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | EN BANC |
| | ) | |
| ALICIA THOMPSON, | ) | |
| | ) | Filed: October 20, 2022 |
| Respondent. | ) | |
| _____ | ) | |

MONTOYA-LEWIS, J.—This court has stated, unequivocally, that we owe a duty to increase access to justice, reduce and eradicate racism and prejudice, and continue to develop our legal system into one that serves the ends of justice. Open Letter from Wash. State Sup. Ct. to Members of Judiciary & Legal Cmty. 1 (June 4, 2020), http://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Judi ciary%20Legal%20Community%20SIGNED%20060420.pdf. Recognizing that a verdict affected by racism violates fundamental concepts of fairness and equal justice under law, we recently held in a criminal case that race-based prosecutorial misconduct can never be "harmless error." *State v. Zamora*, 199 Wn.2d 698, 722,

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

512 P.3d 512 (2022).  Today we emphasize that while the legal framework differs in the civil context, the same principle applies.  Racism is endemic, and its harms are not confined to any place, matter, or issue.  "We show up with the same melanin in our skin whether it is a civil case or . . . a criminal case."  Wash. Sup. Ct. oral argument, *Henderson v. Thompson*, No. 97672-4 (Mar. 16, 2021), at 56 min., 01 sec. to 56 min., 8 sec., *video recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org.  Whether explicit or implicit, purposeful or unconscious, racial bias has no place in a system of justice.[1]  If racial bias is a factor in the decision of a judge or jury, that decision does not achieve substantial justice, and it must be reversed.  *See Zamora*, 199 Wn.2d at 721.

In this case, Janelle Henderson, a Black woman, and Alicia Thompson, a white woman, were involved in a motor vehicle collision.  Thompson admitted fault for the collision but made no offer to compensate Henderson for her injuries.  Henderson claimed that her preexisting condition was seriously exacerbated by the

---

[1] *See, e.g.*, *State v. Towessnute*, 197 Wn.2d 574, 575, 486 P.3d 111 (2020) (recalling the mandate of *State v. Towessnute*, 89 Wash. 478, 154 P. 805 (1916), because the 1916 opinion's racist language and conclusions "continue[d] to perpetrate injustice by their very existence"); *Garfield County Transp. Auth. v. State*, 196 Wn.2d 378, 390 n.1, 473 P.3d 1205 (2020) (overturning as incorrect and harmful *Price v. Evergreen Cemetery Co. of Seattle*, 57 Wn.2d 352, 357 P.2d 702 (1960), which permitted a cemetery to refuse to allow a Black family to bury their child there); GR 37(a) (rule intended to eliminate the unfair exclusion of potential jurors based on race or ethnicity); *State v. Berhe*, 193 Wn.2d 647, 665, 444 P.3d 1172 (2019) (adopting the GR 37 objective observer standard to assess whether one could view implicit racial bias as a factor in the jury's verdict, necessitating a new trial); *State v. Monday*, 171 Wn.2d 667, 680, 257 P.3d 551 (2011) (condemning appeals to racial bias as "fundamentally undermin[ing] the principle of equal justice").

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

collision and sued for damages. During the trial, Thompson's defense team attacked the credibility of Henderson and her counsel—also a Black woman—in language that called on racist tropes and suggested impropriety between Henderson and her Black witnesses. The jury returned a verdict of only $9,200 for Henderson. Henderson moved for a new trial or additur on the ground that the repeated appeals to racial bias affected the verdict, yet the trial court did not even grant an evidentiary hearing on that motion. The court instead stated it could not "require attorneys to refrain from using language that is tied to the evidence in the case, even if in some contexts the language has racial overtones." 1 Clerk's Papers (CP) at 180-81.

That reasoning gets it exactly backward. In ruling on a motion for a new civil trial, "[t]he ultimate question for the court is whether an objective observer (one who is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have influenced jury verdicts in Washington State) could view race as a factor in the verdict." *State v. Berhe*, 193 Wn.2d 657, 665, 444 P.3d 1172 (2019). A trial court *must* hold a hearing on a new trial motion when the proponent makes a prima facie showing that this objective observer could view race as a factor in the verdict, regardless of whether intentional misconduct has been shown or the court believes there is another explanation. At that hearing, the party seeking to preserve the verdict bears the burden to prove that race was not a factor. If that burden is not met, the court must conclude that substantial justice has not been done

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

and order a new trial. CR 59(a)(9). Here, the trial court abused its discretion by failing to grant an evidentiary hearing and also by failing to impose any sanctions for Thompson's discovery violations. We reverse and remand for further proceedings consistent with the framework we announce today.

## FACTUAL BACKGROUND

In June 2014, Thompson rear-ended Henderson's car, injuring Henderson with whiplash. Henderson had a preexisting condition of Tourette's syndrome, a neurological disorder characterized by repetitive, involuntary movements and vocalizations called "tics." She claimed the injury and stress from the collision seriously exacerbated her symptoms, causing aggravated tics and debilitating chronic pain. Henderson filed suit against Thompson, seeking compensation for physical and mental pain and for medical care necessitated by the collision. Thompson admitted that she caused the collision but made no offer in settlement, and the parties proceeded to a jury trial on the question of damages.

### A. Trial

Henderson's lead trial counsel was a Black woman; Thompson's was a white woman. The judge was a white woman, and there were no Black jurors. The only Black people in the courtroom were Henderson, her attorney, and her lay witnesses.

Henderson testified that she managed her Tourette's syndrome with physical therapy and other medical care for most of her life, but since the collision, her

increased symptoms have included new and more intense tics and severe pain. She

requested a damages award of approximately $3.5 million, based on an amount of

$250 per day and actuarial estimate of her life expectancy.

Henderson's treating physicians and several friends and family members

testified that the injury from the collision had a profound effect on her Tourette's

symptoms, pain, and quality of life. In challenging the extent of Henderson's

injuries, the defense presented a short surveillance video of Henderson taken about

nine months after the collision, where she appeared at work with no observable tics.

Two medical experts for the defense opined that any injury from the collision was

likely minor and resolved within about nine months, based, in part, on the video.

Henderson's four lay witnesses each characterized Henderson as active and

energetic prior to the accident, despite minor tics like occasional shrugging and

coughing. But they said after the collision she was plagued by chronic pain and

pronounced tics that prevented her from exercising and going out in public. Three

of her testifying friends and family were Black women, and those witnesses each

used the phrase "life of the party" to describe Henderson prior to the collision, in

contrast with her condition after the collision. 1 Verbatim Report of Proceedings

(VRP) (May 29, 2019) at 344; 2 VRP (May 30, 2019) at 482, 516.

At closing, defense counsel argued that Henderson and her witnesses were not

credible. Henderson points out several instances from Thompson's closing

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

argument as appeals to racial bias.

First, defense counsel characterized Henderson as "confrontational" and "combative" in her manner of testimony. In describing her cross-examination of Henderson, defense counsel said Henderson "was confrontational with me" and called one of her answers "Ms. Henderson's *challenge*." 3 VRP (June 6, 2019) at 1195-96 (emphasis added). Later, she characterized Henderson as "combative" and therefore not credible: "But when it's my turn to cross-examine her, she's not interested in the search for truth; she's interested in being combative. . . . You know, it was—it was *quite combative*. There's—there's definitely no search for the truth there." *Id.* at 1222 (emphasis added). Defense counsel also directly contrasted her description of Henderson's demeanor with Thompson's, using similarly charged terms: "By comparison, my client took the stand, obviously feeling, I think, *intimidated and emotional* about the process and—and rightly so, and provided you with—with *genuine and authentic* testimony." *Id.* (emphasis added).

Second, defense counsel suggested that the only reason for the trial was Henderson's desire for a financial windfall. She said, "It's just a simple car accident; it's a simple rear-end; why are we going through this exercise? And it seems pretty evident that the reason we're going through this exercise is because the ask is for three and a half million dollars." *Id.* at 1195. To put a finer point on it, she suggested that Henderson waited to report the collision to her neurologist until she realized she

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

could profit from the collision: "And she doesn't mention that to her doctor. And you have to ask yourself why. *Is it because $3.5 million hadn't coalesced in her mind yet?*" *Id.* at 1198 (emphasis added). As to the amount of damages, defense counsel called Henderson's calculation of damages at $250 per day "exceptional," but told the jury that if they found that Henderson was injured and her condition was aggravated by the collision, they should apply that value only to the first 8 months of the collision. *Id.* at 1221. She calculated that "by those numbers, that's $60,000 for a rear-end accident. That's a lot of money." *Id.*

Additionally, she described the testimony of Henderson's friends and family as "inherently biased." *Id.* at 1216. She suggested the Black lay witnesses' shared use of a popular idiom to describe Henderson was a sign of collusion: "I thought it was interesting also that all [three] of those witnesses used the exact same phrase when describing Ms. Henderson before the accident: life of the party. *Almost— almost like someone had told them to say that.*" *Id.* at 1213 (emphasis added). She also underscored the detail that at one point, Henderson's chiropractor gave her a job in his office, as if it suggested some impropriety in their relationship: "In terms of bias, I thought it was interesting that [her chiropractor] kind of threw out there the tidbit that suggests that nothing untoward, of course, but he has more than just a patient/physician relationship with—with Ms. Henderson." *Id.* at 1206.

The jury found that Henderson was injured in the collision but awarded her

*Henderson v. Thompson*
No. 97672-4

damages of only $9,200. Following the verdict, Henderson was asked to leave the courtroom before the jury returned. This occurred off the record. Henderson and her legal team recall this coming as a request from the jury.

B.      Discovery Issues

This case also presents issues related to violations of the discovery rules. After the collision, Thompson's defense team hired the private investigation company Probe Northwest Inc. to conduct surveillance on Henderson. The defense identified a Probe employee named Tyler Slaeker as an expert witness who "took video recordings of the surveillance." 2 CP at 217.[2] When Henderson issued a subpoena duces tecum for documents regarding surveillance, the defense produced only Slaeker's resume and a 17-minute video of Henderson taken in March 2015.

When deposed, Slaeker equivocated about whether and how much documentation or other video existed. He believed Probe conducted surveillance on Henderson for about 9 months following the collision, though he followed her only on the day of March 11, 2015. Initially, he said he watched her for over 4 hours and recorded video for about 1 hour; then, he said he recorded for only part of that time. Slaeker also said he had sent surveillance notes via text message to his supervisor, which she used to write a report. But he had no record of the messages, and

---

[2] The defense repeatedly referred to "video recordings" and "CDs of video surveillance" in the plural, later taking the position that they had done so in error and that the items were actually singular. 2 CP at 217; 1 CP at 72.

8

Thompson's counsel told him the report was privileged. He said he prepared for the deposition by reviewing the 17-minute video and some "notes" for 3 hours, but he equivocated about whether they were his original surveillance notes, the Probe report, or new notes he took while reviewing the video. 1 CP at 40, 64.

Henderson made numerous attempts to obtain more information about the surveillance on her. The court denied her first motion to exclude Slaeker as a witness or compel him to produce responsive documents under the subpoena duces tecum. The court did order Slaeker to produce the notes that formed the basis of the report, but he never did. When Henderson issued interrogatories and requests for production regarding the surveillance, the defense produced a single responsive document indicating that Probe billed $5,833.68 for 78.83 hours of surveillance on Henderson between July 2014 and March 2015. They claimed the only other person who conducted surveillance on Henderson was the Probe owner, who drove to Henderson's home at one point but took no notes. They provided no information about who conducted the other 70-some hours of surveillance or what they observed.

Over a year and a half of litigation, despite the court order and Henderson's various attempts to obtain additional information through the discovery rules, the defense never turned over any notes or additional video. When Henderson again moved to exclude Slaeker's testimony or to issue a spoliation instruction for the jury, the trial judge initially granted the instruction. But Thompson moved for

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

reconsideration, and the judge reserved ruling until after Slaeker's testimony, despite noting that "such a failure to keep the raw data is sloppy at best and manipulative at worst." 1 CP at 103. The defense team finally produced what it represented to be the Probe report two weeks before trial, when the court ruled it was not work product.

At trial, the 17-minute surveillance video was played for the jury, and Slaeker was permitted to testify about his day of surveillance. Neither Slaeker nor Thompson could provide any relevant testimony regarding the document calculating 78.83 hours of surveillance work, the rest of the surveillance, or any withheld evidence. The court eventually ruled that it would not instruct the jury on spoliation, even though it "share[d] Plaintiff's deep suspicion that there is other video out there." 3 VRP (June 4, 2019) at 1145. The court did not impose any sanctions.

C.     Procedural History

After the verdict, Henderson filed a CR 59 motion for a new trial or, in the alternative, for additur for an award of $60,000—the amount defense counsel proposed in closing argument. Henderson argued that the court erred in failing to give a spoliation instruction regarding the surveillance and, moreover, that defense counsel's "biased statements in closing likely influenced the jury's unconscious bias against plaintiff such that justice was not done." 1 CP at 134. She pointed to the award far below even the amount the defense had suggested and to the request for Henderson to leave the courtroom as evidence showing the appeals to racial bias

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

must have affected the verdict. She and her attorneys also filed declarations recalling the judge saying the jury wanted Henderson to leave the courtroom before they would exit the jury room, which was "humiliating and embarrassing." *Id.* at 172-77.

The court denied Henderson's motion. With respect to spoliation, the court concluded that there was "scant specific evidence" that additional video or notes had been withheld or destroyed. *Id.* at 179. With respect to the exclusion of Henderson from the courtroom, the judge said it was her own regular practice to ask parties to leave the courtroom before the jury returned after a verdict and not a request by the jury. As to racial bias, the court acknowledged that "using the terms combative in reference to the plaintiff and intimidated in reference to the defendant can raise such bias" but decided "[t]he terms were tied to the evidence in the case, rather than being raised as a racist dog whistle with no basis in the testimony" and "[t]he court cannot require attorneys to refrain from using language that is tied to the evidence in the case, even if in some contexts the language has racial overtones." *Id.* at 180-81.

This court's decision in *Berhe* was filed the next day. Henderson brought a motion for an evidentiary hearing under *Berhe*, but the court denied her request. She appealed the court's denial of her motions for a new trial and for discovery sanctions; we granted direct review. The Loren Miller Bar Association (LMBA) and the American Civil Liberties Union of Washington, Disability Rights Washington, and

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the Seattle Chapter of the National Lawyers Guild filed briefs of amici curiae.

ANALYSIS

We hold that Henderson is entitled to an evidentiary hearing on her new trial motion under CR 59 because she presented a prima facie case that an objective observer could conclude that racial bias was a factor in the jury's verdict. At that hearing, the court must presume racism was a factor in the verdict and Thompson bears the burden of proving it was not. We also hold that the trial court abused its discretion by failing to provide any remedy for Thompson's multiple discovery violations, and that Henderson is entitled to a hearing to assess appropriate sanctions. We reverse and remand for further proceedings consistent with this opinion.

I.      Substantial Justice

We have long recognized that Washington courts have the inherent power to grant a new trial on the ground that substantial justice has not been done. *Cabe v. Dep't of Lab. & Indus.*, 35 Wn.2d 695, 697, 215 P.2d 400 (1950). Indeed, at common law, the right to a jury trial has "existed side by side for centuries" with the trial judge's "historically inherent power" to set a verdict aside and grant a new trial on the ground that substantial justice has not been done. *Bond v. Ovens*, 20 Wn.2d 354, 356-57, 147 P.2d 514 (1944). We have described this power to grant a new trial when substantial justice has not been done not only as within a trial judge's *authority* but as part of their affirmative *duty*. *See, e.g.*, *Severns Motor Co. v. Hamilton*, 35

*Henderson v. Thompson*
No. 97672-4

Wn.2d 602, 604, 214 P.2d 516 (1950); *Potts v. Laos*, 31 Wn.2d 889, 897, 200 P.2d 505 (1948); *Brammer v. Lappenbusch*, 176 Wash. 625, 631, 30 P.2d 947 (1934). Courts retain this inherent power, even while court rules and statutes codify it. *Brammer*, 176 Wash. at 629-32; CR 59(a)(9). We review a trial court's decision on a motion for a new trial for abuse of discretion. *Turner v. Stime*, 153 Wn. App. 581, 588, 222 P.3d 1243 (2009).

Our commitment to substantial justice rings hollow if we fail to recognize that racial bias often interferes with achieving justice in our courts.[3] The LMBA amicus briefing shares perspectives from its members, demonstrating that racial bias continues to affect litigants' ability to receive a fair and impartial civil trial. Its members "have witnessed the effect of bias in Washington's courts and suffered humiliation, condescension, and contempt expressed or allowed by judges in the courtroom. They have been improperly referenced during court proceedings, singled out, and had their expertise questioned due to bias." Amicus Curiae Br. of LMBA at 5-6. This kind of treatment diminishes the legal profession by continuing to tell lawyers of color that their presence seems unusual and surprising. It also undermines

---

[3] *See* Derrick A. Bell, Jr., *Racism In American Courts: Cause For Black Disruption Or Despair?*, 61 CAL. L. REV. 165, 165-66 (1973) ("Perhaps unconsciously, those who have major authority in the legal process tend to underplay the seriousness of racism in the judicial system, acknowledging the need for more progress, while extolling the elimination of overt segregation in the courts. These attitudes show little understanding of the continuing impact of racial bias on [B]lack victims of judicial injustice.).

13

*Henderson v. Thompson*
No. 97672-4

litigants' rights.[4]  For example, "[o]ne [LMBA] member described how they must consider not only how the jury will perceive their civil clients but also the biases opposing counsel may seek to use to undermine a person's credibility; it is difficult when members hear colleagues say, 'she is very Black—how will she come off to the jury?'"  *Id.* at 7; *see also Turner*, 153 Wn. App. at 592-93 (recognizing juror misconduct involving racial bias directed at an attorney likely affected the verdict).

Washington courts have recognized that racist misconduct by the prevailing party or jurors may justify a new trial under CR 59(a)(2).  For example, in 1931, this court ordered a new trial when a white attorney in a civil case argued for a verdict against a company based in Japan because "'we don't like Japanese [people] and they don't like us.'"  *Schotis v. N. Coast Stevedoring Co.*, 163 Wash. 305, 316, 1 P.2d 221 (1931) (quoting the record).  More recently, we ordered a new criminal trial when the prosecutor exaggerated the pronunciation of the word "police" as "'po-leese'" and argued that Black witnesses were not credible because "'[B]lack folk don't testify against [B]lack folk.'"  *State v. Monday*, 171 Wn.2d 667, 671-74, 257 P.3d 551 (2011) (quoting the record).  We strengthened the rule in *Monday* just last term by recognizing that appeals to racial bias that affect a verdict are not subject to review for harmless error—they require reversal.  *Zamora*, 199 Wn.2d at 721.  In

---

[4] *Cf. In re Takuji Yamashita*, 30 Wash. 234, 70 P. 482 (1902) (denying a bar applicant's admission on the basis of race), *disapproved*, 143 Wn.2d xxxiii-lix (2001); *People v. Hall*, 4 Cal. 399, 404-05 (1854) (excluding the testimony of witnesses of color on the basis of race).

14

*Henderson v. Thompson*
No. 97672-4

*Zamora*, we vacated convictions after a prosecutor repeatedly invoked negative stereotypes about Latinx people, immigration, and crime during voir dire, with the apparent purpose to highlight the defendant's perceived ethnicity. *Id.* at 719.

The Court of Appeals has also affirmed the grant of a new trial based on racial bias in a civil case, where during deliberations some jurors referred to counsel, who was of Japanese descent and whose last name was "Kamitomo," as "'Mr. Kamikazi' or 'Mr. Miyashi' or 'Mr. Miyagi.'" *Turner*, 153 Wn. App. at 585-86 (quoting the record). Similarly, the Court of Appeals ordered a new trial for the Black defendant in *State v. Jackson*, where a Black juror overheard a white juror discussing how he disliked "'socializ[ing] with the coloreds [sic],'" because, "[p]resumptively, these statements demonstrated that juror X held certain discriminatory views which could affect his ability to decide Jackson's case fairly and impartially." 75 Wn. App. 537, 540, 543, 879 P.2d 307 (1994) (quoting the record). Each of these cases underscores that a new trial is warranted when racial bias is likely to have influenced a verdict.

While racial bias is often analyzed in terms of misconduct by the jury or the party who prevails at trial, this case demonstrates why CR 59(a)(2) cannot address every instance of racism in our civil justice system.[5] Racial bias can affect a verdict

---

[5] CR 59(a)(2) permits a new trial on the basis of "[m]isconduct of prevailing party or jury." Under that part of the rule, a new trial is warranted when "(1) the conduct complained of is misconduct, (2) the misconduct is prejudicial, (3) the moving party objected to the misconduct at trial, and (4) the misconduct was not cured by the court's instructions." *Teter v. Deck*, 174 Wn.2d 207, 226, 274 P.3d 336 (2012). That basis for a new trial contains procedural prerequisites that

15

*Henderson v. Thompson*
No. 97672-4

even when it is not the product of intentional misconduct by the prevailing party or jury. "Not all appeals to racial prejudice are blatant. Perhaps more effective but just as insidious are subtle references."[6] *Monday*, 171 Wn.2d at 678. Coded "dog whistle" language impermissibly allows the speaker to appeal to racial bias and then excuse that behavior by arguing they did not intend to say anything racist.[7] *See id.* at 678-79 ("Like wolves in sheep's clothing, a careful word here and there can trigger racial bias." (citing studies)).

Moreover, racial bias "can influence our decisions without our awareness," making it uniquely pernicious because "people will act on . . . bias far more often if reasons exist giving plausible deniability." *Berhe*, 193 Wn.2d at 657; *State v. Saintcalle*, 178 Wn.2d 34, 49, 309 P.3d 326 (2013) (plurality opinion) (citing

---

may render it inapplicable here. In particular, Henderson is the prevailing party, as the jury rendered a small judgment in her favor.

[6] For example, racial microaggressions are "often carried out in subtle, automatic, or unconscious forms," but their cumulative effects take a toll both psychologically and physiologically. DANIEL G. SOLÓRZANO & LINDSAY PÉREZ HUBER, RACIAL MICROAGGRESSIONS: USING CRITICAL RACE THEORY TO RESPOND TO EVERYDAY RACISM 34 (James A. Banks ed., 2020). "For example, those targeted by everyday racism can become angry or frustrated and develop feelings of self-doubt; their blood pressure may rise and their heart rate may increase. Over time, they may develop more serious symptomatic conditions such as hypertension, depression, and anxiety." *Id.* at 42 (citations omitted) (citing studies). "Some studies have attributed more fatal conditions such as cardiovascular disease and even increased morbidity to race-related stressors such as microaggressions." *Id.* at 43 (citing studies).

[7] The term "dog whistle" refers to speaking in code to a target audience, where the use of coded language permits the speaker to claim plausible deniability as to that objective. IAN HANEY LÓPEZ, DOG WHISTLE POLITICS: HOW CODED RACIAL APPEALS HAVE REINVENTED RACISM & WRECKED THE MIDDLE CLASS 4 (2014). See Adam R. Shapiro, *The Racist Roots of the Dog Whistle*, WASH. POST, Aug. 21, 2020, https://www.washingtonpost.com/outlook/2020/08/21/racist-roots-dog-whistle/ [https://perma.cc/59C3-JKYG], for a discussion of the origins and evolution of this term.

studies), *abrogated on other grounds by City of Seattle v. Erickson*, 188 Wn.2d 721, 398 P.3d 1124 (2017); *see also* Ian F. Haney López, *Institutional Racism: Judicial Conduct and a New Theory of Racial Discrimination*, 109 YALE L.J. 1717, 1757-61, 1764-69 (2000) (describing how discrimination models that centralize intent fail to address many forms of racism); Charles R. Lawrence III, *The Id, the Ego, and Equal Protection: Reckoning with Unconscious Racism*, 39 STAN. L. REV. 317, 330 (1987) ([Racism] is a part of our common historical experience and, therefore, a part of our culture. It arises from the assumptions we have learned to make about the world, ourselves, and others as well as from the patterns of our fundamental social activities. . . . We attach significance to race even when we are not aware that we are doing so."). Courts must therefore focus on the effect of racially biased comments or actions, not the intent of the actor, when evaluating whether a verdict has been affected by racism. By focusing on whether substantial justice has been achieved, CR 59(a)(9) provides the appropriate lens for assessing the effect of racial bias instead of the intent of any individual in determining whether a new trial is warranted. A verdict affected by racial bias is incompatible with substantial justice and requires a new trial under CR 59(a)(9).

Henderson appropriately invokes CR 59(a)(9) as one basis for her new trial motion. She argues that substantial justice has not been done because defense counsel's comments during cross-examination and closing arguments that drew on

17

racial stereotypes, along with the jury's astonishingly small award and the request to remove Henderson from the courtroom, support the conclusion that appeals to racial bias affected the verdict.

>     A.    The *Berhe* Inquiry

This court recently announced, in a criminal case, a two-step inquiry for determining whether racial bias has affected the verdict. *Berhe*, 193 Wn.2d at 665-69. Under *Berhe*, the court must grant an evidentiary hearing upon a prima facie showing of evidence that, if "taken as true, permits an inference that an objective observer who is aware of the influence of implicit bias could view race as a factor in the jury's verdict." *Id.* at 666. This standard speaks to possibility, not certainty, and to impact, rather than intent.

Civil and criminal litigants are equally entitled to a trial by an unbiased jury. Contrary to Thompson's contention, the right to a trial by an unbiased jury is not limited to those accused of committing crimes. "'The right to trial by jury includes the right to an unbiased and unprejudiced jury, and a trial by a jury, one or more whose members is biased or prejudiced, is not a constitutional trial.'" *Mathisen v. Norton*, 187 Wash. 240, 245, 60 P.2d 1 (1936) (civil case) (quoting *Alexson v. Pierce County*, 186 Wash. 188, 193, 57 P.2d 318 (1936) (civil case)); *see also Allison v. Dept. of Lab. & Indus.*, 66 Wn.2d 263, 265, 401 P.2d 982 (1965) (civil case). "An 'impartial jury' means 'an unbiased and unprejudiced jury,' and allowing bias or

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

prejudice by even one juror to be a factor in the verdict violates a defendant's [or a plaintiff's] constitutional rights and undermines the public's faith in the fairness of our judicial system." *Berhe*, 193 Wn.2d at 658 (quoting *Alexson*, 186 Wash. at 193). There is no reason to hold our state's courts to any lower standard than the "objective observer" articulated in GR 37 or to tolerate a lesser standard of justice in a civil setting than what we require in a criminal setting under *Berhe*.

Therefore, we apply a similar framework when a civil litigant seeks a new trial on the basis that racial bias affected the verdict. We hold that upon a motion for a new civil trial, courts must ascertain whether an objective observer who is aware that *implicit, institutional, and unconscious biases, in addition to purposeful discrimination*, have influenced jury verdicts in Washington State *could* view race as a factor in the verdict. *See Berhe*, 193 Wn.2d at 665. When a civil litigant makes a prima facie showing sufficient to draw an inference of racial bias under this standard, the court must grant an evidentiary hearing to determine if a new trial is warranted. *Id.* at 665-66. At the hearing, the trial court is to presume that racial bias affected the verdict, and the party benefiting from the alleged racial bias has the burden to prove it did *not*. *Cf. Monday*, 171 Wn.2d at 680 (placing the burden of proof on the State when a prosecutor allegedly appeals to racial bias). If they cannot prove that racial bias had no effect on the verdict, then the verdict is incompatible with substantial justice, and the court should order a new trial under CR 59(a)(9).

We conclude that Henderson has made a prima facie showing that an objective observer could view race as a factor in the verdict, and the trial court erred in denying an evidentiary hearing. We take this opportunity to provide guidance on how this prima facie showing should be assessed.

### B. Henderson Has Established a Prima Facie Case

Henderson alleges that Thompson's counsel primed the jurors with appeals to racial bias throughout the trial. Henderson points to numerous instances that permit an inference that an objective observer could conclude race was a factor in the verdict. *Berhe*, 193 Wn.2d at 666. For example, defense counsel repeatedly characterized Henderson as "combative" and "confrontational." These terms evoke the harmful stereotype of an "angry Black woman." *See* Trina Jones & Kimberly Jade Norwood, *Aggressive Encounters & White Fragility: Deconstructing the Trope of the Angry Black Woman*, 102 Iowa L. Rev. 2017, 2049 (2017). This harmful negative stereotype affects the way others perceive and interact with Black women, and it can have significant negative social and interpersonal consequences for Black women, including influencing their experience and reasonable expression of anger.

Defense counsel also directly contrasted Henderson with Thompson, describing Thompson as, "[b]y comparison, . . . intimidated and emotional about the process and—and rightly so, and provid[ing] . . . genuine and authentic testimony." 3 VRP (June 6, 2019) at 1222. The direct contrast between defense counsel's

20

*Henderson v. Thompson*
No. 97672-4

depiction of Henderson as "confrontational" and "combative" and her depiction of Thompson as "rightly" "intimidated" and "emotional" distorted the roles of plaintiff and defendant, casting Thompson—the person responsible for injuring Henderson—in the role of the victim to whom the jury owed more sympathy than the actual injured party. This invited the jury to make decisions on improper bases like prejudice or biases about race, aggression, and victimhood.[8]

During closing arguments, Thompson's counsel alluded to racist stereotypes about Black women as untrustworthy and motivated by the desire to acquire an unearned financial windfall. Defense counsel argued that Henderson's injuries were minimal and intimated that the sole reason she had proceeded to trial was that she saw the collision as an opportunity for financial gain. *Id.* at 1195 ("And it seems pretty evident that the reason we're going through this exercise is because the ask is for three and a half million dollars."), 1198 (arguing that Henderson did not inform one of her doctors about the collision soon enough "because $3.5 million hadn't coalesced in her mind yet"). Defense counsel's argument that Henderson was exaggerating or fabricating her injuries appealed to these negative and false stereotypes about Black women being untrustworthy, lazy, deceptive, and greedy.[9]

---

[8] *See* Megan Armstrong, *From Lynching to Central Park Karen: How White Women Weaponize White Womanhood*, 32 HASTINGS WOMEN'S L.J. 27, 32-42 (2021).

[9] *See* Marilyn Yarbrough & Crystal Bennet, *Cassandra and the "Sistahs": The Peculiar Treatment of African American Women in the Myth of Women as Liars*, 3 J. GENDER RACE & JUST. 625, 636-39 (2000) (describing the myths of the "Jezebel" and the "welfare queen," among others).

*Henderson v. Thompson*
No. 97672-4

Presenting a case in this way can allow jurors to make decisions on impermissible grounds rooted in prejudice or biases about race and money.

Additionally, defense counsel relied on racist stereotypes about Black people and us-versus-them descriptions to undermine the credibility of Henderson and her witnesses. For example, defense counsel suggested that Henderson had probably asked her friends and family to lie for her, as evidenced by their shared use of a popular idiom—"life of the party"—to describe her. *Id.* at 1213. This argument was akin to the prosecutorial misconduct we condemned in *Monday*, where the prosecutor asserted that Black witnesses were unreliable because there was a "code" that "'[B]lack folk don't testify against [B]lack folk.'" 171 Wn.2d at 676 (quoting the record). Intimating that the Black witnesses had joined together to lie for the Black plaintiff could invite jurors to suspect them as a group and to make decisions based on biases about race and truthfulness. Similarly, defense counsel argued that Henderson's chiropractor was likely to lie for her because they had more than just a doctor-patient relationship, implying that hiring her to work in his office demonstrated impropriety in their relationship. This strategy could open the door to speculation that plays directly on prejudice or biases about race and sexuality.

---

The myth of the "welfare queen" refers to a woman who purposefully "shuns work" in order to live off public benefits, "a non-existent social phenomenon based on a singular incident of abuse of welfare benefits by one woman in Chicago in the 1970s." *Id.*; BRITTNEY COOPER, ELOQUENT RAGE: A BLACK FEMINIST DISCOVERS HER SUPERPOWER 197 (2018) (explaining the harm of the "welfare queen" myth).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Trial judges abuse their discretion in denying an evidentiary hearing on a motion for a new trial when presented with a prima facie showing that an objective observer could view race as a factor in the verdict. *Berhe*, 193 Wn.2d at 665. Courts have an *obligation* to ensure that trials are conducted fairly and to recognize when substantial justice has not been done. *Id.* at 661-62; *Severns Motor Co.*, 35 Wn.2d at 604. In this case, the trial judge acknowledged that the comments defense counsel made in closing had "racial overtones" "in some contexts" but then failed to engage in any analysis of what effect the racially coded language could have had on the jury. 1 CP at 181. This was an opportunity missed to apply that acknowledgement to the case and to recognize how an objective observer could view the defense's comments as causing racial bias to become a factor in the verdict. *Berhe*, 193 Wn.2d at 665.

Rather than considering the perspective of the objective observer under *Berhe*, the trial court judge viewed the facts from her own perspective. She agreed with Thompson's counsel that it was fair to describe Henderson's demeanor during cross-examination as "combative" and "confrontational," opining that this language should be excused because the term was "race neutral" and tied to the evidence. Br. of Resp't at 34-39; 1 CP at 180. Paradoxically, the trial court also acknowledged that "using the terms combative in reference to the plaintiff and intimidated in reference to the defendant *can* raise such bias." 1 CP at 180 (emphasis added). As this court explained in *Berhe*, a race-neutral alternative explanation does not excuse

the effect of language that appeals to racial bias. 193 Wn.2d at 666.

When a participant in the trial uses language that *could* evoke racist stereotypes, courts should not presume that such language has no effect—on them or on the jurors. The harm in an appeal to racial bias is in its effect on the decision-maker, regardless of the intent behind the reference, because "people will act on . . . bias far more often if reasons exist giving plausible deniability." *Saintcalle*, 178 Wn.2d at 48-49. Indeed, trial courts should be deeply concerned about the possibility that racism has affected any trial, and courts should grant a new trial when an objective observer *could* conclude that racism was a factor in the verdict. *Cf. State v. Lahman*, 17 Wn. App. 2d 925, 938, 488 P.3d 881 (2021).

An objective observer could conclude that the themes and arguments advanced by defense counsel suggested Henderson and her witnesses were not credible because of their race, and considering the totality of the circumstances of this trial, an objective observer could therefore conclude that racism affected the verdict. *Berhe*, 193 Wn.2d at 666. Henderson has established a prima facie case entitling her to an evidentiary hearing on her motion for a new trial.

C.     The Burden at the Hearing

When a party raises a prima facie claim that racial bias affected the verdict, the court must hold a hearing to determine whether an objective observer under the GR 37 standard could conclude that racial bias was a factor in the verdict. *Berhe*,

*Henderson v. Thompson*
No. 97672-4

193 Wn.2d at 666; CR 59(e). If the evidence, taken as true, permits an inference that an objective observer could reach this conclusion, the party has made a prima facie showing that a new trial should be ordered. *Berhe*, 193 Wn.2d at 666. At that juncture, the trial court must presume that it affected the verdict, and the party allegedly responsible for introducing the appeals to bias has the burden to prove it did not affect the verdict. *Cf. Monday*, 171 Wn.2d at 680 (placing the burden on the State to prove that prosecutorial misconduct did not affect the verdict in a criminal case). If the party that benefited from an appeal to racial bias cannot prove it did not affect the verdict, then substantial justice has not been done, and the court must order a new trial. As in the criminal context, where racial bias has had an effect on the verdict, we will not consider any claim that the error was harmless. *Zamora*, 199 Wn.2d at 721.

Applying this standard, we reverse the decision below and remand for the trial court to conduct a hearing on Henderson's motion for a new trial. On remand, Henderson's case should be reassigned to a different judge in light of the opinions the judge has already expressed as to the reasons for Thompson's counsel's behavior, as well as the reasons Henderson was excluded from the courtroom when the jury returned its verdict. *State v. McEnroe*, 181 Wn.2d 375, 387, 333 P.3d 402 (2014) (A case may be reassigned if "the trial judge will exercise discretion on remand regarding the very issue that triggered the appeal and has already been

25

*Henderson v. Thompson*
No. 97672-4

exposed to prohibited information, expressed an opinion on the merits, or otherwise prejudged the issue." (footnotes omitted)).

We next turn to Henderson's claim that the trial court erred by refusing to consider sanctions for Thompson's discovery violations.

## II.     Discovery Sanctions

"[A] spirit of cooperation and forthrightness during the discovery process is necessary for the proper functioning of modern trials." *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 342, 858 P.2d 1054 (1993).  Our civil rules require parties to engage in discovery in good faith and provide sanctions for violations of the rules. CR 26, 37.  Parties "must *fully* answer all interrogatories and all requests for production, unless a specific and clear objection is made." *Fisons*, 122 Wn.2d at 354 (citing CR 33(a), 34(b)).  Our liberal discovery rules aim to make civil trials "'a fair contest with the basic issues and facts disclosed to the fullest practicable extent.'"  *Id.* at 342 (internal quotation marks omitted) (quoting *Gammon v. Clark Equip. Co.*, 38 Wn. App. 274, 280, 686 P.2d 1102 (1984)).  "'This system obviously cannot succeed without the full cooperation of the parties,'" so courts have authority to deter "'unjustified or unexplained resistance to discovery'" through sanctions. *Id.* (quoting *Gammon*, 38 Wn. App. at 280).  The sanction rules grant judges considerable discretion "'to determine what sanctions are proper in a given case'" in order to "'reduce the reluctance of courts to impose sanctions.'" *Id.*

26

at 339 (internal quotation marks omitted) (quoting *Cooper v. Viking Ventures*, 53 Wn. App. 739, 742-43, 770 P.2d 659 (1989)).

When a party intentionally withholds or destroys evidence, the trial court may issue a spoliation instruction for the jury to draw an inference that the missing evidence would be unfavorable to the party at fault. *Pier 67, Inc. v. King County*, 89 Wn.2d 379, 385-86, 573 P.2d 2 (1977) ("[W]here relevant evidence which would properly be a part of a case is within the control of a party whose interests it would naturally be to produce it and [they] fail[] to do so, without satisfactory explanation, the only inference which the finder of fact may draw is that such evidence would be unfavorable to [them]."). Courts consider the potential importance or relevance of the missing evidence and the culpability of the adverse party. *Henderson v. Tyrrell*, 80 Wn. App. 592, 607, 910 P.2d 522 (1996). The culpable conduct "must be connected to the party against whom a sanction is sought." *Cook v. Tarbert Logging, Inc.*, 190 Wn. App. 448, 462, 360 P.3d 855 (2015). Courts consider "[w]hether destruction of the evidence gave the culpable party an investigative advantage." *Id.* Sanctions decisions are reviewed for an abuse of discretion involving a decision that is manifestly unreasonable or based on untenable grounds. *Fisons*, 122 Wn.2d at 338-39.

Here, Henderson sought information about Probe's surveillance throughout the discovery period—repeatedly, using multiple mechanisms provided in the civil

rules. Henderson issued a subpoena duces tecum and deposed Slaeker, the person the defense team identified as responsible for the surveillance video. When Slaeker indicated that his notes informed a report on Probe's surveillance of Henderson, Henderson served interrogatories and requests for production seeking the report. But the defense team avoided producing any additional information and evaded a court order directing it to do so. They produced the purported report over a year later, just two weeks before trial—only after a court order ruling it was not privileged—and too late for Henderson to conduct additional discovery. Henderson had no opportunity to verify its contents or authorship. *Cf. Cook*, 190 Wn. App. at 462; *Henderson*, 80 Wn. App. at 607-08. This is, by definition, prejudice to the litigant.

Additionally, Slaeker repeatedly stated he reviewed notes that were in existence at the time of his deposition. Slaeker equivocated about which notes these were, but he was consistent about the fact that he used some surveillance-related documentation to prepare for the deposition for hours—documentation that was never produced to Henderson.

Last, the defense produced a document indicating that Probe conducted more than 78 hours of surveillance on Henderson over a period of 9 months and repeatedly indicated that multiple surveillance recordings existed; yet, the defense never produced more than the 17 minutes of video from March 15, 2011. They never provided an explanation for why there was no video from any other day of

surveillance in those 9 months. Even if there truly was no other video beyond what the defense produced, almost all of the 78 hours of surveillance remained unaccounted for. The absence of any additional surveillance video conflicts with Slaeker's testimony that he had handwritten notes and text messages (that he did not produce) from those hours of surveillance. If he did not see Henderson during that surveillance and saw her only for the 17 minutes of video produced, there seems to be no need to take detailed, but unproduced, notes nor any need to have discussions via text message.

It is difficult to conceive of what more Henderson could have done to identify the evidence she was seeking, determine that it was discoverable, and utilize the rules of civil procedure to obtain the material. *Cf. Fisons*, 122 Wn.2d at 354. Rather than meeting the expectation of cooperation and forthrightness we require in our civil legal system, the defense took advantage of every opportunity to avoid complying with Henderson's very clear and reasonable requests. *Id.* at 342. There is no doubt that Thompson's defense team understood the relevance and significance of the video. *Cook*, 190 Wn. App. at 462. Particularly given how the defense team continued to behave toward Henderson and her legal team at trial, it is difficult to explain this conduct as anything other than a pattern of underestimating and undervaluing the position of both Henderson and her counsel. *See* Frank M. McClellan, *The Dark Side of Tort Reform: Searching for Racial Justice*, 48 RUTGERS

L. REV. 761, 761-774, 795-96 (1996) (explaining how private attorneys often improperly consider the race of both plaintiffs and their attorneys in evaluating the value of tort cases). Even absent the later appeals to racial bias during trial, this kind of obstructionist discovery behavior would typically incur sanctions ranging from limitations of the use of the material at trial, instructions to the jury on spoliation, monetary sanctions against the party engaging in these tactics, or, in the most egregious of circumstances, dismissal of the matter entirely. *Henderson*, 80 Wn. App. at 605 ("the severity of a particular act . . . determines the appropriate remedy").

Henderson demonstrated prejudice resulting from the defense's refusal to produce any additional surveillance-related evidence. As Henderson's claim involved a preexisting condition that was aggravated by the collision, the defense's strategy was to prove that her symptoms had either remained in or returned to a relatively manageable status. The 17-minute surveillance video depicting Henderson at work with no observable tics could be viewed as strong evidence that she was not suffering 9 months after the collision, and it formed the basis of the defense experts' opinions to that effect. Without any information about what the other 9 months of surveillance revealed, Henderson was completely unable to show that those 17 minutes were not representative of how she was managing after the collision. Given that the withheld evidence would have been crucial to Henderson's ability to challenge the 17-minute surveillance video and the defense's repeated

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

refusals to comply with Henderson's many clear requests, we agree that a spoliation instruction should have issued and that some additional sanction also would have been proper. Instead, the trial court chose not to sanction the defense's conduct at all, resulting in an effective endorsement of the defense team's conduct.

Trial courts have wide latitude to determine what sanctions are appropriate. *Fisons*, 122 Wn.2d at 355. Henderson has continued to request sanctions under *Fisons* for the defense team's conduct during discovery, and she also argues that the defense should be sanctioned for making appeals to racial bias throughout trial. Sanctions are mandatory when a party violates a civil rule. *Id.* The court should determine the severity of the sanction commensurate with the severity of the wrongdoing in order to serve the purposes of sanctions "to deter, to punish, to compensate[,] and to educate." *Id.* at 356. Intent is not a prerequisite to imposing sanctions, though the court may take the wrongdoer's state of mind into account when determining the severity of the sanctions to impose. *Id.* at 345, 356. When the court finds intent to spoil or hide evidence—which appears likely to have occurred here—the more severe sanctions would be appropriate. Sanctions can range from reprimands,[10] excluding evidence,[11] instructions on negative inference,[12]

---

[10] *See Miller v. Badgley*, 51 Wn. App. 285, 303, 753 P.2d 530 (1988).
[11] *See Scott v. Grader*, 105 Wn. App. 136, 142, 18 P.3d 1150 (2001).
[12] *See Henderson*, 80 Wn. App. at 606-07.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

default judgment or dismissal,[13] or monetary sanctions on the party, attorney, or firm.[14] While some delaying tactics might be common in civil trials, the degree of the defense team's refusal to cooperate in this case was egregious. Thompson's defense team failed to produce relevant evidence despite Henderson's counsel's painstaking efforts to obtain it through the discovery rules. Ultimately, it is the trial court's role to determine what sanctions should be imposed and against whom. *Id.* at 355. We therefore remand to the trial court to determine whether to impose sanctions up to and including a new trial excluding the surveillance video, Slaeker's testimony, or both, as well as reasonable costs and attorney fees for the first trial.[15] *Id*.

## CONCLUSION

Our legal system is based on the premise of judicial neutrality, procedural fairness, and equal treatment. We know our system has not lived up to its promises, even as we have reaffirmed our commitment to them. The legal system is made up of people—lawyers, judges, jurors, and others—and it shares in our human strengths and weaknesses. All of us have the capacity to push our system closer to the ideals

---

[13] *See Magaña v. Hyundai Motor Am.*, 167 Wn.2d 570, 583-84, 220 P.3d 191 (2009); *Rivers v. Wash. State Conf. of Mason Contractors*, 145 Wn.2d 674, 686, 41 P.3d 1175 (2002).

[14] *See Fisons*, 122 Wn.2d at 356; *Madden v. Foley*, 83 Wn. App. 385, 392, 922 P.2d 1364 (1996).

[15] The trial court may consider in its sanctions analysis these pretrial discovery violations as well as defense counsel's conduct during trial.

32

and promises of justice; we also have the ability to continue to perpetuate harm. To turn our system squarely toward fairness requires conscious effort and honesty when we fail.

Courts take a step toward achieving greater justice when the people who comprise them comprehend the legacy of injustices built into our legal systems, actively work to prevent racism before it occurs, and also recognize how our participation in these systems may reify them. One way judges can do so is to ensure that we bring reality into sharp focus in our legal analysis. When a new trial is sought on the ground that racial bias affected the verdict, the facts must be viewed through the lens of an objective observer who is aware "that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have influenced jury verdicts in Washington State." *Berhe*, 193 Wn.2d at 665. In a hearing based on prima facie evidence that racial bias possibly affected the verdict, the court must presume that it did and the party seeking to uphold the verdict must prove how it did not. If they cannot prove that racial bias was not a factor, that verdict is fundamentally incompatible with substantial justice. We reverse and remand to the trial court for further proceedings consistent with this opinion.

*Henderson v. Thompson*
No. 97672-4

_____
Montoya-Lewis, J.

WE CONCUR:

_____
González, C.J.

_____
Johnson, J.

_____
Madsen, J.

_____
Owens, J.

_____
Stephens, J.

_____

_____
Yu, J.

_____
Whitener, J.

34

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Henderson v. Thompson*, No. 97672-4
(Gordon McCloud, J., concurring)


No. 97672-4

GORDON McCLOUD, J. (concurring)—I agree with the majority's

conclusion that misconduct tainted the discovery process and that racism against

the Black female plaintiff, Janelle Henderson, tainted the jury trial. I also agree

with the majority's decision that the remedy for Henderson's prima facie showing

that racial bias was a factor in the verdict is a trial court evidentiary hearing in

which the defendant bears the burden to prove that it was not such a factor. And I

further agree with the majority's direction to the trial court to determine the

appropriate sanctions for defendant's discovery violations.

I write separately only to express disagreement with the majority's

characterization of certain aspects of defense's closing argument. As the majority

notes, three of Henderson's lay witnesses used an identical phrase, "life of the

party," to describe Henderson before the accident. Majority at 5. In closing

argument, defense counsel argued that the witnesses' shared use of this phrase

suggested that they coordinated their testimony in advance of trial. 3 Verbatim

Report of Proceedings (June 6, 2019) at 1213.

1

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The majority characterizes this argument as an impermissible appeal to racial bias and compares it to the prosecutorial misconduct we condemned in *State v. Monday*, 171 Wn.2d 667, 678-79, 257 P.3d 551 (2011). Majority at 22. In that case, the prosecutor explicitly argued that Black witnesses were unreliable because there was a "code" that "'[B]lack folk don't testify against [B]lack folk.'" *Monday*, 171 Wn.2d at 676 (quoting the record). We condemned the prosecutor's argument because there was no evidence in the record to support it and because it amounted to an "attempt to discount several witnesses' testimony on the basis of race alone." *Id.* at 678.

By contrast, in this case, the defense used testimony in evidence in order to attack the witnesses' credibility by suggesting prior planning. In other words, there was evidentiary support for the limited argument that these three witnesses' testimony suggested that they might have coordinated their approach. In my view, that limited argument was not an improper appeal to racial bias.

Similarly, I believe that parties must be able to explore witnesses' financial and other interests that might undermine their credibility. For that reason, I disagree with the majority's conclusion that it was an improper appeal to racial

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Henderson v. Thompson*, No. 97672-4
(Gordon McCloud, J., concurring)

bias for defense counsel to argue that the trial was all about "Henderson's desire for a financial windfall." Majority at 6.[1]

I nevertheless agree with the majority that the balance of the transcript provides a prima facie showing that the trial was infected with racial bias. I therefore fully join the rest of the opinion.

_____
Gordon McCloud, J.

_____
Madsen, J.

---

[1] I do not read the majority's decision to undermine our precedent concerning the importance of probing cross-examination designed to address witness credibility. Our adversarial system requires courts to permit searching cross-examination of witnesses to test their perception, recall, and reliability. *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974) ("Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested."); *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 607, 260 P.3d 857 (2011) ("[E]vidence is tested by the adversarial process within the crucible of cross-examination, and adverse parties are permitted to present other challenging evidence." (citing *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 596, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993))); *State v. Darden*, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002).

3